Filed 2/24/23  P. v. Valtierra CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>HILEBERTO VALTIERRA,<br><br>        Defendant and Appellant. | A165832<br><br><br>(Fresno County<br>Super. Ct. No. F19908265) |

Hileberto Valtierra appeals after a jury convicted him of one count of second degree murder (Pen. Code, § 187, subd. (a); count one),[1] one count of second degree attempted murder (§§ 187, subd. (a), 664; count two), and three counts of assault with a firearm (§ 245, subd. (a)(2); counts three, four, and five). The jury also found true the charged firearm enhancements— that he personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) in committing counts one and two and that he personally used a firearm (§ 12022.5, subd. (a)) in committing counts three through five. After the trial court found true allegations that Valtierra suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds.

_____

[1] Undesignated statutory references are to the Penal Code. This matter was transferred by California Supreme Court order on August 9, 2022 from the Fifth Appellate District (No. F081769) to the First Appellate District.

1

(a)-(d)), Valtierra was sentenced to an indeterminate prison term of 200 years to life plus a determinate term of 30 years.

Valtierra raises several arguments—that the trial court violated his constitutional rights to a public trial, to represent himself, and to confront the witnesses against him. He also contends the trial court improperly limited the scope of his cross-examination of a prosecution witness. We conclude Valtierra's arguments are without merit and affirm.

## BACKGROUND

### A.

In December of 2019, Valtierra and his girlfriend (Leticia R.) argued about her daughter P.T.'s alleged gang membership. Leticia decided to end their relationship and began moving out of the San Joaquin apartment she had been sharing with Valtierra's sister. While Leticia's brother and three of her children (P.T., A.T., and E.T.) helped load Leticia's possessions, Valtierra repeatedly insulted Leticia using profanity and gang slurs.

Sixteen-year-old A.T. told Valtierra to be respectful and the two engaged in a verbal argument. E.T. got out of Leticia's brother's truck, ran towards Valtierra, and the two physically fought—punching and wrestling each other on the ground. Members of both Leticia's and Valtierra's families crowded around the fight.

The prosecution evidence is in conflict in some respects— about whether A.T. kicked Valtierra in the head, who was winning the fight, and whether the fight was over when shots were fired. However, the prosecution witnesses agreed that neither Leticia nor any of her family members (her brother, A.T., E.T., or P.T.) had a gun that night.

After pointing a gun at P.T.'s and Leticia's heads, Valtierra shot at A.T. several times from no more than 10 feet away.

2

Valtierra continued to fire at A.T.'s back as he fell to the ground. Prosecution witnesses also testified that, when E.T. ran towards the back of a nearby apartment building, Valtierra chased and shot him twice in the back. Valtierra also fired the gun at Leticia's brother, as he ran to his truck, but missed.

A.T. died as a result of suffering a gunshot wound to his left shoulder. He also suffered two other gunshot wounds—to his rear right hip and to the back of his head. E.T. suffered two gunshot wounds but survived.

Valtierra fled to Salinas. Three weeks later, a gun was found, in a field near San Joaquin, about 20 feet from the side of a road. A firearms expert opined that all nine casings found at the crime scene had been fired from the recovered gun.

When Valtierra was interviewed by a detective with the Fresno County Sheriff's Department, he initially claimed to not remember anything that happened after the fight began. Valtierra later told detectives that there was no reason for the shooting, that he did not see any other guns, that he did not think he was going to die during the fight, that he was not afraid of A.T, and that he felt bad about what happened.

**B.**

At trial, Valtierra changed his story. He testified that he was knocked out during the fight and woke up (on his back) with E.T. choking him. Valtierra pushed E.T. off, scrambled to his feet, and then fell back down. Valtierra then heard and saw shots being fired by Leticia's brother, in Valtierra's direction. Valtierra fired five to six rounds at E.T., who was coming toward him.

Valtierra denied shooting A.T. and testified that he never pointed the gun at Leticia, her brother, or P.T. He believed Leticia's brother shot A.T.

3

Valtierra admitted discarding his gun as he drove to Salinas.  He also acknowledged that he never told detectives that he had been kicked in the head or that Leticia's brother had a gun.  Valtierra said he suffered a concussion and could not remember details of the fight until seven or eight months later.

## C.

The jury acquitted Valtierra of first degree murder of A.T. but convicted him of second degree murder of A.T., second degree attempted murder of E.T., and three counts of assault with a firearm.

## DISCUSSION

### A.

Valtierra argues that his state and federal constitutional rights to a public trial were violated because one of his family members was excluded from the courtroom during a portion of jury selection and during argument on motions in limine.  We disagree.

### 1.

A criminal defendant has a constitutional right to a public trial.  (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15; *People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*).)  This right extends to jury selection and pretrial evidentiary hearings, which are presumptively required to be open to the public unless necessary to protect an overriding interest (such as the defendant's right to fair trial).  (*Presley v. Georgia* (2010) 558 U.S. 209, 213; *Waller v. Georgia* (1984) 467 U.S. 39, 44-46; *People v. Bui* (2010) 183 Cal.App.4th 675, 680 (*Bui*).)

"The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are

4

being followed and that deviations will become known." (*Press-Enterprise Co. v. Superior Court of California* (1984) 464 U.S. 501, 508, italics omitted.) Violation of an accused's constitutional right to public trial is structural error, requiring reversal without the necessity of showing prejudice. (*Waller v. Georgia, supra,* 467 U.S. at pp. 49-50; *Woodward, supra*, 4 Cal.4th at p. 381.)

However, not every instance of exclusion from the courtroom violates an accused's public trial rights. California courts deem some temporary and partial exclusions de minimis or trivial. (*Bui, supra,* 183 Cal.App.4th at pp. 688-689; *People v. Esquibel* (2008) 166 Cal.App.4th 539, 552-554.) Federal courts also recognize a de minimis exception. (See, e.g., *Gibbons v. Savage* (2d Cir. 2009) 555 F.3d 112, 121; *United States v. Al-Smadi* (10th Cir. 1994) 15 F.3d 153.)

**2.**

Valtierra was tried in July and August of 2020—amid the COVID-19 pandemic. Before trial began, the trial court, prosecutor, and defense counsel discussed access to the courtroom. The trial court explained that the trial would be open to the public, but that jury selection could limit access to the courtroom—because the court needed to prioritize space for prospective jurors and allow room for social distancing.

Specifically, the court stated, "if I don't have social distancing, [public access is] going to be limited, and we can probably accommodate as many folks as we need during the trial itself, but during jury selection when we have jurors actually sitting out there, if we have room, they can come in; if we don't [have room], they don't. [¶] . . . [¶] . . . Because there's nothing else we can do unless we cut a hole in the roof and have folks sitting up there, and that's not practical." Defense counsel made no objection.

5

On the third day of trial, the courtroom was initially cleared to hear Valtierra's in camera motion to substitute his counsel, pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). The minute order shows jury selection began at around 10:00 a.m. The court spent 36 minutes taking roll and giving preliminary instructions to prospective jurors before they were dismissed until the following day. Next, the minute order and reporter's transcript show that court reconvened for approximately 41 minutes (without prospective jurors) while counsel argued evidentiary issues. The court then took a break for lunch.

When the court began its afternoon session , defense counsel made the following record outside the presence of prospective jurors:

"[DEFENSE COUNSEL]: . . . I just have a concern as to this being a public trial, and I know that the Court had previously ordered anyone who wanted to watch the trial and had approached downstairs and told them they were going to come to [the courtroom] to watch the trial, that they should be admitted. I was informed by my investigator that a member of Mr. Valtierra's family did so and was . . . denied entry.

"THE COURT: Okay. Well, that's incorrect, because he should have anybody he wants to come can come. . . . I think we're going to have three different courtrooms. They may not necessarily be sitting in here. They may be sitting in a court next to us, but they'll be able to see us, hear us, we'll be able to hear them just like anything else.

"[DEFENSE COUNSEL]: I just want to make sure the procedure gets corrected.

"THE COURT: Absolutely.

"THE BAILIFF: We were told - - we advised during jury selection no one's going to come in because we need to make room

6

for the jurors.  It's not open - - you know, they're not going to be hearing anything, so I don't understand why someone needs to come and watch jury selection.

"THE COURT:  No, but the thing is that's part of the trial.

"THE BAILIFF:  So you'd rather have a juror displaced and have someone come in here?

"THE COURT:  No, no, no.  I'm not arguing.  What I'm saying is, we have to have it open, and we have three courtrooms that we can sit somebody, and somebody can sit in.  We're going to be done with jury selection very soon. [¶] . . . [¶]

'THE BAILIFF:  . . . I was gone.  I was told by whoever sat in here they said your order was once the trial starts, then we advise the lobby, then they'll let people in.

"THE COURT:  Let's do this:  Let's advise the lobby that folks can come in, assuming they don't have a fever, assuming they are masked and so forth, and we will accommodate them.  If that means them sitting here, all likely not, it's more likely they'll sit next door . . . but we have to make it open, otherwise, we have to broadcast it.  Um, do you know how to do that, [clerk]?

"THE CLERK:  Broadcast it, yes, we can.

"THE COURT:  Are you requesting we broadcast it?

"[DEFENSE COUNSEL]:  Your Honor, I would ask that it be broadcast to make it a public trial, although, I would note [the [prosecutor] had some concerns about that given the fact that there were minors testifying. [¶] . . . [¶]

"[PROSECUTOR]:  My major concern was the witnesses watching other witnesses' testimony.

"THE COURT:  Right, right, right.  That's why we had this conversation before.

7

"[PROSECUTOR]: We did, and that's why I agree with the procedure of anybody who wants to come into [the courtroom], comes into [the courtroom.]

"THE COURT: That's what we're going to do. Obviously, we had the discussion. I thought it out in the past. I'm not going to revisit it because there's no new facts. So we're going to leave that as it is, but we're going to make absolutely certain that if Mr. Valtierra's family or anybody else wants to come in and see, they'll have access to come in."

After the jury was sworn, the trial court reiterated that Valtierra's family (except for those who were witnesses) and any other members of the public were free to enter the courtroom. Defense counsel stated for the record, "Valtierra's family was allowed in yesterday by the Court security. They were under subpoena, though, so they could not watch the trial but they were allowed in."

**3.**

Valtierra insists that the trial court committed structural error—requiring reversal without a showing of prejudice—by completely closing the trial to the public without articulating any overriding interest or ensuring that the closure was no broader than necessary. The People, on the other hand, argue that the record demonstrates only a de minimis exclusion that did not rise to the level of a constitutional violation. The People have the better argument.

*Bui, supra*, 183 Cal.App.4th 675, involved the temporary exclusion of three spectators, including two of the defendant's family members, from about 40 minutes of jury voir dire. (*Id.* at pp. 679, 685-686, 688.) On appeal, the temporary and partial exclusion—which did not involve the evidentiary phase of trial and was rectified as soon as the trial court learned that the family members had been admonished not to talk before the

8

prospective jurors—was deemed de minimis and not in violation of the defendant's public trial right.  (*Id*. at pp. 686-689.)  This Division recognized that "the Sixth Amendment right to a public trial 'is not trammeled . . . by a *trivial, inadvertent* courtroom closure.' " (*Bui, supra*, at p. 687, italics added; accord, *id*. at pp. 688-689.)

In *Woodward, supra*, 4 Cal.4th 376, the trial court permitted the bailiff to temporarily lock the courtroom doors during the prosecutor's closing argument.  (*Id*. at pp. 379, 383.)  Our Supreme Court held that the closure was de minimis because it lasted only one and one-half hours, did not exclude preexisting spectators (who were in the courtroom when the doors were locked), and did not involve the evidentiary phase of trial.  (*Id*. at pp. 379, 381, 385-386.)

Valtierra asks us to distinguish *Bui* and *Woodward* by presuming that, in this case, the courtroom was closed to *all* spectators during the entire morning session of the third day of trial.  The bailiff's volunteered statements on the record before us do not make it clear that anyone other than Valtierra's single family member (much less *all* spectators) was excluded from the courtroom.  Furthermore, the bailiff appeared to believe that spectators could be excluded only during jury selection—to ensure prospective jurors could abide by spacing protocols.  Accordingly, it is unclear whether anyone who tried to enter the courtroom during the other proceedings that morning would have been excluded.  On this record, we must resolve this issue against Valtierra because he fails to meet his burden on appeal to demonstrate a complete closure of the courtroom.  (See *People v. Whalen* (2013) 56 Cal.4th 1, 85; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

We also find limited support for Valtierra's assertion that the exclusion involved an entire morning.  Our review of the relevant minute order and reporter's transcripts demonstrates

9

only that one spectator was inadvertently excluded during (at most) one hour and 17 minutes of jury selection and argument on in limine motions. No evidence was received during this time. The trial court ordered the trial to be public and rectified the inadvertent closure as soon as it was brought to the court's attention.

Although we do not condone the mistake, we agree with the People that the trial court did not violate Valtierra's right to a public trial. (See *Woodward, supra,* 4 Cal.4th at pp. 385-386; *Bui, supra,* 183 Cal.App.4th at pp. 686-689; *United States v. Al-Smadi, supra,* 15 F.3d at pp. 154-155.)

**B.**

Valtierra also contends the trial court violated his Sixth Amendment rights when it terminated his self-representation. We conclude the trial court did not abuse its discretion. (See *People v. Becerra* (2016) 63 Cal.4th 511, 518-519 [standard of review] (*Becerra*).)

**1.**

A criminal defendant possesses two mutually exclusive constitutional rights with respect to representation. The accused has the right to be represented by counsel at all critical stages of a criminal prosecution. (*United States v. Cronic* (1984) 466 U.S. 648, 658-659; *People v. Marshall* (1997) 15 Cal.4th 1, 20.) At the same time, because the Sixth Amendment grants the defendant a personal right to present a defense, the accused also possesses a right of self-representation. (*Faretta v. California* (1975) 422 U.S. 806, 819 (*Faretta*); *Marshall, supra,* 15 Cal.4th at p. 20.)

A trial court generally must grant a defendant's request for self-representation if certain conditions are met. (*People v. Doss* (2014) 230 Cal.App.4th 46, 54.) First, the defendant must be mentally competent, and must make their request knowingly and intelligently, having been apprised of the dangers of self-

10

representation. (*Faretta, supra*, 422 U.S. at p. 835; *Becerra, supra,* 63 Cal.4th at p. 519.) Second, the defendant must make their request unequivocally. (*Faretta, supra*, at p. 835; *Becerra, supra*, at p. 519.) Third, an accused must make their request within a reasonable time *before* trial. (*People v. Welch* (1999) 20 Cal.4th 701, 729.) If a *Faretta* motion is made after trial begins, the defendant is no longer constitutionally entitled to self-representation. An untimely motion is addressed to the trial court's discretion. (*People v. Windham* (1977) 19 Cal.3d 121, 128.)

The right of self-representation has other limits. A defendant may not represent themself if they are unwilling or unable to abide by courtroom rules and protocol. (See *McKaskle v. Wiggins* (1984) 465 U.S. 168, 173; *Becerra, supra,* 63 Cal.4th at p. 518.) Accordingly, a trial judge may terminate an accused's pro per status if they "deliberately engage[] in serious and obstructionist misconduct." (*Faretta, supra*, 422 U.S. at pp. 834-835, fn. 46; accord, *Becerra, supra,* at p. 518.)

Erroneous revocation of an accused's *Faretta* status is reversible per se. (*People v. Butler* (2009) 47 Cal.4th 814, 824–825; see also *McKaskle v. Wiggins, supra,* 465 U.S. at p. 177, fn. 8.)

## 2.

On the date set for trial, Valtierra appeared with appointed counsel. Both defense counsel and the prosecutor announced they were ready to proceed. The court heard argument and ruled on various motions in limine. Two court days later, Valtierra made a *Marsden* motion, which was denied.

On the morning of the fifth court day, while jury selection was still ongoing, Valtierra moved to represent himself, under *Faretta, supra,* 422 U.S. 806. The court noted that it had discretion to grant the motion because Valtierra's motion was

11

made after trial began. The court also advised Valtierra of the consequences of self-representation and that it would not merit a continuance.

During its admonitions, the trial court warned Valtierra: "You will be responsible for selecting the jury, asking the appropriate questions. You will get zero assistance. If you . . . [ask] inappropriate questions, I will shut you down." It also advised Valtierra: "[Y]ou must not abuse the dignity of the Court. Understand the Judge may terminate your right to self-representation in the event that you engaged in serious conduct [sic] or obstruct the conduct and progress of the trial."

After being further advised of the risks of self-representation, the following exchange occurred on the record:

"THE DEFENDANT: So regarding the jury, we're not done selecting jury trial.

"THE COURT: No, we're not.

"THE DEFENDANT: Okay. So then I just have one question to ask then. That is: Does any one of them have any issue or problem with the fact that I've tested positive for corona virus . . . within the past month and have not yet retested for a negative result, and inmates in my pod are experiencing symptoms like myself having a headache today.[2] Is that . . . okay to ask them? I think that should - -

"THE COURT: No. No, it's not okay to ask them.

---

[2] The record indicates that the Fresno County jail was under COVID-19 quarantine about a month earlier. Valtierra tested positive 16 days before he appeared in court for trial, but tested negative in the interim. At the time he made his *Faretta* motion, it had been at least 25 days since Valtierra's positive test.

"THE DEFENDANT: All right. Because they don't know that information. . . . [T]hey're not going to be concerned about that, and you are ordered not to tell them that.

"THE DEFENDANT: All right. That was on the record; right?

"THE COURT: That is on record. . . . [¶] . . . [¶]

"THE DEFENDANT: What I'm saying, Your Honor, is at this point I'm not ready to proceed to trial. I'm not ready to proceed with trial. [¶] . . . [¶]

"THE COURT: Trial's going to go forward. Are you sure you want to represent yourself?

"THE DEFENDANT: Yes, I do.

"THE COURT: Okay. . . . I'm going to bring the jurors back in. I'm going to give you an opportunity to talk to them. I'm going to excuse and relieve [defense counsel]. . . . We're going forward. And I know that sounds harsh, but you and I had this conversation before when I told you during the course of the *Marsden* [hearing], I said, 'Look, the only way that you can steer the ship is if you represent yourself and file a *Faretta* motion.' You waited over the weekend, and now we're on Friday, and now you're saying you want to have the *Faretta*, and I've granted your *Faretta,* so you're going to represent yourself, and we're going to move forward. [¶] . . . [¶]

"THE COURT: . . . [Defense counsel], we'll see you later. Be prepared because I'm bringing the jury back in here, and you're going to be required to question them. Do not bring up anything about no [*sic*] COVID, none of that.

"THE DEFENDANT: I'm going to be honest.

"THE COURT: What was that?

"THE DEFENDANT: I'm going to be honest.

13

"THE COURT:  If you bring up anything about COVID - -

"THE DEFENDANT:  Might as well revoke it now.

"THE COURT:  You're not going to - -

"THE DEFENDANT: · What I'm saying is it is a very serious issue. · People are dying, over 100,000 are dying, so why would we subject people to my infection? · Why would we do that?

"THE COURT: · All right. · The Court's revoking self-representation. · The record's clear."  (Italics added.)

**3.**

Valtierra contends the trial court abused its discretion because it purportedly terminated his self-representation without warning, without making an adequate record that he engaged in misconduct sufficient to justify termination, and without considering alternative sanctions.  He is wrong.

Termination of self-representation is a severe sanction that should be imposed as a last resort.  (*Becerra, supra,* 63 Cal.4th at pp. 518, 520.)  " 'When determining whether termination is necessary and appropriate, the trial court should consider several factors in addition to the nature of the misconduct and its impact on the trial proceedings,' including (1) 'the availability and suitability of alternative sanctions,' (2) 'whether the defendant has been warned that particular misconduct will result in termination of in propria persona status,' and (3) 'whether the defendant has "intentionally sought to disrupt and delay his trial." ' " (*Id*. at p. 518.)

*People v. Carson* (2005) 35 Cal.4th 1 (*Carson*) involved termination based on out-of-court misconduct.  In that situation, the trial court must make additional efforts to create an adequate record supporting its decision.  (*Becerra, supra,* 63 Cal.4th at p. 518; *Carson, supra,* at p. 11.)  But when in-court misconduct forms the basis for termination, the reporter's transcript will

generally suffice.  (*Carson, supra*, at p. 11.)  We defer to the trial court's " 'assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial.' "  (*Becerra, supra*, at p. 518.)

Here, Valtierra was warned that he could not use self-representation to delay trial and that he needed to follow courtroom rules and protocol.  The trial court also specifically (and repeatedly) warned Valtierra that he could not discuss his positive COVID-19 test result (or symptoms) with prospective jurors during voir dire.  In response, Valtierra explicitly indicated that he understood his *Faretta* status could be revoked for his failure to heed the trial court's orders on that subject.  Despite this understanding and the court's repeated orders not to, Valtierra persisted with his plan to inflame the prospective juror's fears about COVID-19.  Accordingly, the record amply supports the trial court's implicit finding that Valtierra intentionally sought to use his self-represented status to disrupt and delay the trial.

Valtierra insists that the trial court abused its discretion because it failed to consider lesser sanctions.  However, his appellate briefs fail to demonstrate the adequacy of any other sanction.  (See *Carson, supra*, 35 Cal.4th at p. 12.)  Valtierra's only suggestion is that the trial court should have allowed him to proceed and then—after the prospective jurors had been informed of the jail quarantine, Valtierra's positive test result, and his purported symptoms—admonish the prospective jurors to disregard his statements and to trust the safety measures already in place.  When considering the impact Valtierra's disclosure would have on prospective jurors' willingness to serve, the inadequacy of this lesser sanction is self-evident.

This brings us to the crux of Valtierra's argument—that his refusal to heed court orders was insufficient to warrant termination because the trial court did not permit him to

15

continue his disobedience and to *actually* disrupt and delay the trial. But the trial court was under no such obligation. (See *Carson, supra,* 35 Cal.4th at p. 10 ["the defendant's acts *need not* result in a disruption of the trial" because "[t]he likely, *not the actual*, effect of the misconduct should be the primary consideration"], italics added.)

Repeatedly refusing to obey court orders and intentionally attempting to delay trial is precisely the kind of serious misconduct that threatens to impair the integrity of trial. (See *Carson, supra,* 35 Cal.4th at p. 10; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1516.) The trial court did not abuse its discretion.

## C.

Next, Valtierra maintains the trial court violated his Sixth Amendment right of confrontation by requiring witnesses to wear protective face masks while testifying. Like the other courts of appeal that have considered similar arguments (see, e.g., *People v. Edwards* (2022) 76 Cal.App.5th 523, 525-527), we disagree.

The trial court ordered all persons in the court, including testifying witnesses, to wear a mask. Valtierra asked the trial court to lift that requirement for testifying witnesses, arguing the jury would otherwise be unable to judge credibility. The trial court denied his motion.

The United States Supreme Court understands the confrontation clause to reflect a strong *preference* for face-to-face confrontation at trial. But that preference is not absolute and must occasionally give way to important public policy considerations. (*Maryland v. Craig* (1990) 497 U.S. 836, 844, 847-850.) "The central concern of the confrontation clause 'is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' [Citation.] This

16

concern is satisfied when the witness: (1) is physically present for his or her testimony; (2) testifies under oath; (3) is subject to cross-examination; and (4) may have his or her demeanor observed by the trier of fact." (*People v. Bharth* (2021) 68 Cal.App.5th 801, 814.)

Accordingly, a defendant's right to confront witnesses may be satisfied without a traditional face-to-face confrontation at trial where "denial of such confrontation is necessary to further an important public policy" and "the reliability of the testimony is otherwise assured." (*Maryland v. Craig, supra,* 497 U.S. at p. 850.)

Here, the trial court's mask requirement was necessary to further an important public policy—protecting the health and safety of trial participants during a global pandemic. And all the confrontation clause's central reliability concerns remained otherwise assured: witnesses testified in the defendant's and jury's physical presence, witnesses were under oath, and witnesses were subject to cross-examination and observation of demeanor by the trier of fact. True, Valtierra and the jury may have been impeded from observing witnesses' full facial expressions because testifying witnesses wore face masks that covered their noses and mouths. But because Valtierra and the jury remained able to hear witnesses speak, as well as see their eyes and body language, they could meaningfully observe witnesses' demeanor.

Valtierra's confrontation rights were not violated by the trial court's requirement that witnesses cover their mouths and noses to further public safety during a global pandemic.[3] (See

---

[3] We need not further consider Valtierra's argument that the trial court should have ordered testifying witnesses to wear clear masks. In support of that argument, Valtierra filed a request for judicial notice of various advertisements showing the costs of clear masks on Amazon.com. The Fifth District deferred

*People v. Edwards, supra,* 76 Cal.App.5th at pp. 525-527; *People v. Lopez* (2022) 75 Cal.App.5th 227, 230; *People v. Alvarez* (2022) 75 Cal.App.5th 28, 37-39.)

## D.

Finally, Valtierra argues that the trial court abused its discretion and violated his constitutional rights to confront witnesses by limiting his cross-examination of one of Leticia's children (P.T.). We disagree.

Before trial, the People moved to limit the defense's questioning of P.T. regarding statements she made, to an employee of the Fresno County Department of Social Services (Department), which suggested P.T. was not present at the scene of the shooting. The purported prior statement conflicted with P.T.'s anticipated testimony at trial. P.T. testified that she was present at the scene of the shooting. Because every other witness to the shooting (including Valtierra himself) similarly placed P.T. at the scene, the People insisted the defense's proposed line of questioning was on a collateral matter.

Initially, the trial court concluded that defense counsel could ask P.T., on cross-examination, about her prior statement but that testimony from the Department employee would not be admitted. But when the court learned that P.T. had since denied telling anyone at the Department that she did not witness the

---

ruling on the opposed motion, and we now deny the request for judicial notice. Valtierra fails to demonstrate that the advertisements were noticed by the trial court (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326) or that the content of the advertisements represent "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h); *Searles Valley Minerals Operations, Inc. v. State Bd. of Equalization* (2008) 160 Cal.App.4th 514, 519.)

18

shooting, the court granted the People's motion and excluded the evidence. The trial court concluded that, under Evidence Code section 352, the evidence's probative value was substantially outweighed by its undue consumption of time.

The trial court did not abuse its discretion. Valtierra is correct that P.T.'s alleged statement to the Department employee was inconsistent with her testimony at trial. And the jury may consider any matter that tends to prove or disprove the truthfulness of a witness's testimony. (*People v. Harris* (2005) 37 Cal.4th 310, 337; accord, Evid. Code, § 780.) However, Evidence Code section 352 grants a trial court broad discretion to exclude impeachment evidence to " 'prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301.) And although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, trial judges also retain wide latitude under the confrontation clause to impose reasonable limits on such cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679.)

Here, the proffered evidence did not directly suggest that P.T.'s testimony *at trial* was untruthful. Rather, because it was undisputed that she testified truthfully at trial that she witnessed the shooting, any inconsistency primarily tended to show P.T. had lied to a Department employee in the context of a child welfare investigation.

Furthermore, because P.T. denied making the purported inconsistent statement, defense counsel would need to call the Department employee to testify about the content of P.T.'s earlier statement. Accordingly, her earlier statement would have no probative value unless actually inconsistent and at the same time required an undue consumption of time. The trial court did not abuse its discretion by excluding the evidence pursuant to

19

Evidence Code section 352. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328; *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456-1457.)

Nor has Valtierra demonstrated a violation of the confrontation clause. A trial court's limitation on cross-examination does not violate the confrontation clause unless a reasonable jury would have obtained a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 680; *People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.) Valtierra's defense counsel impeached P.T. in other ways—by highlighting inconsistencies between her trial testimony and both her preliminary hearing testimony and her earlier statements to police. Where evidence would impeach a witness on a collateral matter and is only marginally probative of their veracity, application of Evidence Code section 352 to exclude the evidence does not infringe a defendant's constitutional confrontation rights. (*People v. Jennings* (1991) 53 Cal.3d 334, 372.)

### E.

We need not consider Valtierra's argument that the cumulative effect of trial errors requires reversal of the judgment because we have rejected all his arguments on the merits.

### DISPOSITION

The judgment is affirmed.

_____

BURNS, J.

We concur:

_____

JACKSON, P.J.

_____

SIMONS, J.

A165832