Filed 3/10/23  P. v. Manago CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076611 |
| v. | (Super.Ct.No. FVI17003315) |
| STEWART MANAGO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Tony Raphael, Judge. Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland , Assistant Attorney General, Andrew Mestman and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Stewart Manago was sentenced to 25 years to life in prison under the "Three Strikes" law after a jury convicted him of one felony count of reckless evasion and one felony count of evasion against traffic and found he'd suffered three prior strike convictions. On appeal, Manago argues the court abused its discretion in revoking his right to represent himself before trial. He also asks us to review the sealed transcript of the court's in-camera *Pitchess*[1] proceedings to determine whether it erred in denying his request to disclose the personnel records of various law enforcement officers. We find no error on either issue and affirm the judgment.[2]

## I

## FACTS

A.    *The Incident, Trial, and Verdict*

On December 4, 2017, Barstow police received a call reporting Manago was driving while armed with a gun. Soon after, an officer located him driving southbound on the 15 freeway with two female passengers and tried to pull him over. Manago refused and led the officer on a 25-mile pursuit that ultimately required the assistance of additional police units and a CHP helicopter. Manago drove dangerously during the chase—speeding, running a stop sign, straddling lanes, and driving on the wrong side of the road—and finally surrendered after driving into an apartment complex with a dead end. On the way to jail, he said he would have surrendered earlier but wanted to get to a

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).
[2] In a separate order filed concurrently with this opinion we summarily deny the habeas petition Manago filed while this appeal was pending.

place where his family could record his interaction with the police because he didn't feel safe.

At trial, Manago claimed he hadn't realized the police were chasing him because, when the pursuit began, he was already being followed by a member of the Mexican Mafia who had threatened him with a gun earlier in the day. As a result, he figured the police were after his pursuer, not him. On cross-examination, he admitted he told police after his arrest that he'd assumed they were after him because he had removed his GPS tracking device while on parole. One of Manago's passengers testified that someone had pulled a gun on them earlier in the day but also said she hadn't noticed anyone else following them on the freeway besides the police.

The jury found Manago guilty of one count of recklessly evading an officer (Veh. Code, § 2800.2, count 1) and one count of evading an officer against traffic (Veh. Code, § 2800.4, count 2). In a separate trial, they also found he had suffered three serious and violent strike convictions for forcible rape, first degree residential burglary, and residential robbery. (Pen. Code, §§ 667, subd. (b)-(i) & 1170.12, subd. (a)-(d).) Although the evasion offenses were not serious or violent felonies, Manago was still subject to sentencing under the Three Strikes law due to the fact his rape conviction was a super strike. As a result, the court sentenced him to 25 years to life on count 1 and stayed punishment on count 2 under Penal Code section 654.

B.    *Manago's Pretrial Self-Representation*

This case was one of two the prosecution filed against Manago in late 2017; the other was a domestic violence case involving allegations Manago had beaten and stabbed his wife, Lillian. The two cases were never consolidated, but the trial court handled them together for pretrial purposes. In November 2019, after Manago had been representing himself in both cases for nearly two years, and after receiving two separate warnings from the court that his right to self-representation was in peril, the court found he was intentionally being obstructionist so as to delay his trials and revoked his pro per status in both cases.

It's beyond dispute that Manago was an extremely difficult litigant. During the 19 months he represented himself, he filed over 50 motions in each case and frequently tried to have both the court and the prosecution sanctioned, disqualified, and arrested. As points of reference, the transcripts of the period he represented himself span more than five volumes, and the People's summary of his conduct consumes 34 pages of their appellate brief. For our purposes, though, we think the following summary suffices to address his claim of error.

1.  *Proceedings before Judge Stodghill*

On February 9, 2018, about a week after the information in this case was filed, Riverside County Superior Court Judge John Tomberlin granted Manago's *Faretta* motion to represent himself.[3] He was, at the time, already representing himself in the

---

[3] *Faretta v. California* (1975) 422 U.S. 806.

4

domestic violence case. At that same hearing, Manago exercised his peremptory challenge against Judge Tomberlin after the judge rejected his claim that the prosecution shouldn't be allowed to call Lillian as a witness in the domestic violence case. He accused the judge of not taking his case "seriously" and being unable to be "fair and impartial."

On February 13, his cases were transferred to Judge Bryan Stodghill. At his first hearing before Judge Stodghill two days later, he moved to disqualify the district attorney's office. He argued the prosecutor was conspiring against him by falsely claiming in a motion to consolidate the two cases that his current charges involved three counts of child molestation. The prosecutor said the mistake was inadvertent, that he'd been working off a document in a different case and failed to delete the irrelevant charges. Manago said he planned to sue both the prosecutor and the public defender who had represented him before his *Faretta* motion was granted for conspiring to have him "assassinated" in custody by slandering him as a child molester.

The court ordered all references to the irrelevant charges stricken from the motion but rejected Manago's claim of bad faith. Manago told the court it was wrong but was "entitled to [its] opinion." He requested appointment of new counsel on the evasion case, and the court reappointed the public defender.

By the next hearing on March 9, Manago had filed on his own behalf two additional motions to disqualify the district attorney, one for each case. At the start of the hearing, he said he refused to recognize the public defender as his counsel because he

5

was the same attorney who'd represented him before and had failed to protect him from the false molestation charges. Judge Stodghill granted Manago's *Faretta* motion, and Manago raised an issue that would prove to be his main focus over the next 18 months—discrediting Lillian's prior statement to the police in which she'd identified him as her assailant in the domestic violence case.

Manago told the court he'd been talking and corresponding with his wife from jail and she'd made it very clear she didn't want to testify against him at trial. He also claimed the officer who interviewed her and testified at the preliminary hearing, Officer Helms, was lying and had in fact coerced her to blame him for her injuries. When the court denied his request for an order allowing him to interview Lillian from jail, he became argumentative and made frequent interruptions, prompting the court to issue two separate warnings about his conduct. Judge Stodghill warned him he was "going to have problems being pro per if you keep cutting me off," and, minutes later, warned, "[i]f you keep interrupting me I'm going to shut you down, Mr. Manago. You have a habit of continually doing that."

Manago moved to dismiss the domestic violence case, arguing his Sixth Amendment confrontation rights had been violated because Lillian had been allowed to assert her Fifth Amendment right to refuse to testify during his preliminary hearing. Judge Stodghill denied the motion, and Manago replied he would be seeking a change of venue and moving to disqualify the judge at the next hearing.

The next 14 months continued in much the same fashion, with Manago filing dozens of frivolous motions and repeatedly trying to relitigate the court's rulings. His conduct caused Judge Stodghill to warn him on multiple occasions that he was being obstructive and disrespectful.

On April 6, Manago filed several motions including a motion to enforce his speedy trial rights, for discovery violations by the prosecution, to allow him to appear in court free of physical restraints, to suppress evidence, as well as one for certified copies of reporter's transcripts to support his "complaint with the commission on judicial performance." Unable to address all of them, Judge Stodghill told Manago that his motions were not only overly voluminous but also frivolous. "The Court has reviewed numbers and scores of your motions. I can tell you the Court reviewed just yesterday until 3:00 in the morning, approximately 15 motions filed by you, Mr. Manago, and in there you made lots of allegations. You made lots of assertions; however, the Court did not find any support for those assertions or allegations."

Ignoring the court's concern, Manago filed several motions in advance of the next hearing on April 24, including multiple motions for reconsideration, a motion to dismiss for prosecutorial perjury and misconduct, and motions to sanction the prosecutor. The court rejected Manago's claims of illegal government conduct and repeatedly tried to explain to him the nature of the proceedings.

During the same hearing, Judge Stodghill gave Manago another warning about his disorderly and disrespectful conduct. "You know what? If you're not going to limit

7

yourself to the arguments we're going to be done. I'm spending my whole morning doing this. I've cleared my calendar to listen to all of your motions. One thing I'm not going to tolerate is you being inappropriate or making little smart remarks about how I am handling the calendar. I told you, I'm hearing your motion but you have a ton of motions here. I'm going to try to go through them. I'm not going to tolerate you being disrespectful when I'm trying to accommodate you. . . . I spent hours reading through these motions, and set my calendar. You see there's nobody here? You know why? Because I set this day special for you." Manago responded to the court's remarks by claiming he wasn't "getting a fair shake."

At the same hearing, Manago returned to the issue of his wife's testimony, repeating his claim that his confrontation rights had been violated and demanding the court give Lillian immunity to testify. When the court explained that only the prosecution had the authority to issue immunity, Manago became argumentative, saying he knew the issue better because, unlike Judge Stodghill, he'd attended the preliminary hearing. "I was there. You weren't there, okay." He told the judge to go back and read the preliminary hearing record, saying, "I'm not misreading anything. And if you believe that I'm misreading something, you need to conduct a 1368, 1369, see that I'm competent to stand trial." Judge Stodghill interrupted Manago to issue another warning. "[T]he one thing I'm not going to do, Mr. Manago, is I'm not going to have you be disrespectful to this Court. I've been respectful to you. I've given you a chance to talk. . . . If you can't be respectful, we're going to do this a different way. . . . I'm going to respect you, and

8

you're going to respect this Court. You're not going tell me what I mean. . . . I read the transcript, and I made a finding that's different than yours, period."

Manago said that because Officer Helms was going to lie on the stand he planned to "instruct the bailiff" to arrest him for perjury, as well as anyone else who lied during his trial. The judge responded, "no one is going to follow your order."

In late July 2018, Manago filed another motion to disqualify Judge Stodghill for bias. In denying the motion, the judge explained his rulings had been based on the law and that he had "taken great pains" to address all of Manago's issues and review all of his motions even though many of them were "repetitive and duplicative." "I am not biased, Mr. Manago. I'm trying to get this case to trial. I'm trying to get you what you need to get you to trial. You continually file motions in this case."

On August 2, Manago moved for a citizens arrest of Judge Stodghill, arguing he "obstructed justice" by accepting the prosecutor's lie about Lillian and Officer Helms. He claimed the prosecutor had bribed Officer Helms to testify against him at the preliminary hearing by offering the officer immunity for prior acts of misconduct in the line of duty. The court stopped Manago, explaining, "I've ruled on that, Mr. Manago. I understand that you think that I'm obstructing justice because . . . you claim [the prosecutor] was somehow underhanded and that he was going to give one of the deputies immunity, and that's not what this Court believes. The Court read the transcripts. The Court does not believe for a second that that's what [the prosecutor] was intending when he was talking about immunity. He was talking about it for [Lillian]." Manago told the court it was

9

wrong, and the court issued another warning about tone. "Mr. Manago, I'm not going to argue with you. We're done. . . . I'm going to tell you again, and I'm not going to tolerate, I'm not going to tolerate the arguing. . . . I had a full calendar today that I had to stop early so I could give you time to present your motions. [N]ormally motions take 10 to 15 minutes. Yours take hours. . . . I'm not going to let you continue to argue the same thing over and over and over again"

On August 30, Manago moved for a citizen's arrest of Officer Helms, arguing he lied in his report and at the preliminary hearing by saying Lillian had been stabbed. "She never had a stab wound on her body. Still don't got one today. So he falsified his police report." Judge Stodghill denied the motion and several others, including another motion to grant Lillian immunity and to sanction and arrest the prosecutor.

On February 7, 2019, Manago raised another issue that would end up being a recurring concern of his in both cases. He argued the prosecutor had directed jail staff to remove his work product from his cell. He said after the removal he was transferred to a different facility and he hadn't been able to access the materials since. The court promised to look into the whereabouts of his materials. Later in the hearing, as Manago was presenting a lengthy and meandering argument about why he needed to subpoena an array of records from the Department of Corrections and the Barstow Police Department to prove the agencies were involved in a conspiracy with the district attorney's office, Judge Stodghill told Manago he needed to limit his arguments to relevant topics. "[W]e're never going to get through all of your motions. . . . I have a stack of motions

and I know you want to make your record and I'm going to let you but if you could be as efficient as possible so that I don't get too far behind. You keep continuing motions and we're never going to get you to trial."

On March 21, the court addressed and denied a number of successive motions from Manago (including a fifth *Pitchess* motion, a motion to reconsider the ruling on a prior *Pitchess* motion, and a motion for sanctions against Barstow and its city attorney for obstruction of justice), and admonished Manago for bringing renewed motions on issues that had been fully litigated. Manago responded, "If the court may recall I'm contending that I was framed [and that Officer Helms] engaged in serious misconduct, falsification of records, et cetera." Judge Stodghill told Manago he'd already reviewed Officer Helms's file and hadn't found anything relevant to his claims of misconduct. He said if Manago kept trying to relitigate his rulings "again and again" they were "never going to get to a place where we're ready for trial."

On April 11, the court held an evidentiary hearing to determine the whereabouts of Manago's work product. Sergeant Cahow, who was stationed at High Desert Detention Center (High Desert), said staff had confiscated some of Manago's paperwork because he had exceeded the maximum amount allowed by jail policy. Manago then damaged the remaining paperwork by setting off the sprinkler in his cell. When he set the sprinkler off a second time, they transferred him to West Valley Detention Center. Sergeant Cahow said Manago could have access to the confiscated paperwork upon request—"[it's] somewhere in the system . . . we can find it."

11

On May 6, 2019, Judge Stodghill addressed another motion Manago had filed to disqualify him. He denied the motion as frivolous but explained he was nevertheless exercising his discretion to recuse himself from both cases because "circumstances . . . have arisen and come to this Court's mind that make me believe that I can't be fair to you and give you a fair trial."

### 2. *Proceedings Before Judge Camber*

Manago's cases were reassigned to Judge Michael Camber, who held his first hearing on May 10, 2019. At the start of the hearing, advisory counsel (who'd been appointed in both cases several months earlier) asked to be relieved, explaining, "[t]he documents that have been filed and letters that I have received make me believe that Mr. Manago would be better served by better counsel" who would be "interested in taking on the challenge."[4] Judge Camber granted counsel's motion, and continued the cases for two weeks to "read all of [Manago's] motions."

### a. *The court orders this case tried first*

When he recalled the matter on May 24, Judge Camber informed the parties that he'd gotten up to speed on the evasion case and ordered that it would be tried first. After the prosecutor represented he could be ready to go to trial within a month, by July 7, Manago said he wasn't ready for trial because the prosecutor was withholding discovery and he needed a new investigator. After discussing discovery with the parties, Judge

---

[4] Advisory counsel "is appointed to assist the self-represented defendant if and when the defendant requests help." (*People v. Blair* (2005) 36 Cal.4th 686, 725.)

12

Camber found the prosecutor had fulfilled his obligations and ruled that discovery was closed.

At the beginning of the next hearing, Judge Camber denied Manago's motion to have the domestic violence case tried before this case, explaining he had already made his decision. The judge then held an ex parte conference with Manago to inform him his investigator had sent the court an email saying she refused to work for him anymore "due to the way he has treated me." Manago agreed to prepare a list of pending investigation areas so the judge could decide whether to appoint a new investigator.

Back in the presence of the prosecutor, the judge reiterated the importance of handling the two cases separately, beginning with the evasion case. "So everything I am talking about now is the [evasion] case. After we do [that] case, we can talk about all the issues on the other one." Later in the hearing, Manago became angry when the judge denied his request for advisory counsel. He threatened to file a motion to disqualify the judge and refused to answer whether he'd be ready to discuss his investigation at the next hearing.

On June 21, Manago agreed to waive time on the evasion case, but refused to do so on the domestic violence case. Noting they were still far from the 60th day on the domestic violence case, the court put the issue off for another time.

By the next hearing on July 12, Manago had filed another *Pitchess* motion, a motion to disqualify Judge Camber, another motion to recuse the district attorney's office, a motion to report the prosecutor to the State Bar, and another motion to dismiss

13

the case. At the start of the hearing, the judge informed Manago that the investigator who was refusing to work with him was also refusing to send him her file. The judge appointed Manago a new investigator and "signed an order authorizing payment for [the former investigator] to make copies of everything that she has on [the] case and to deliver to the Court as soon as possible."

In advance of the hearing on August 30, Manago filed several more motions, including another motion for sanctions against the prosecution and another motion to dismiss premised on prosecutorial misconduct. At the hearing, Manago refused to waive time on the domestic violence case. He said the "only thing" he needed was his lost work product and if that was returned to him he'd be ready to go to trial on that case immediately. The court asked if he would be willing to waive time so they could try to locate them, and Manago said no.

The court held another hearing on Manago's missing work product on September 6. Sergeant Cahow said the documents had either been delivered to Manago (and he was denying that fact) or had been lost during his transfer from High Desert to West Valley, but he emphasized that staff would not have intentionally destroyed them or thrown them out. Judge Camber found Manago's materials were missing but declined to find bad faith on the part of the sheriff's department. Manago said he needed more discovery and witness examinations to prove Sergeant Cahow was lying and they did in fact have his work product. The judge directed Manago to focus instead on the effect the loss had on his ability to present a defense. "The fact is they looked for your work product. It's not

14

there. And you're not going to be able to get it back. The only way to proceed is what effect does that have on your case. *One effect is it gives you another basis for a continuance*. But another effect is based on that, have you been so damaged in your ability to represent yourself that you can't get a fair trial." (Italics added.)

On September 13, the court heard Manago's motion to dismiss based on the loss of his work product. Manago argued the prosecutor had orchestrated the removal of the documents from his cell because he knew how damaging the materials were to law enforcement and the district attorney's office. The court repeatedly and unsuccessfully tried to redirect Manago to instead demonstrate how the loss impacted his ability to prepare a defense. The judge denied the motion, explaining that while he took the matter seriously, Manago had failed to demonstrate how the loss of his materials affected his ability to present a defense.

The judge told Manago the last day to start trial on the evasion case was September 24 unless he was willing to waive time. He said if Manago waived time, he'd be able to continue his investigation and try to recreate his lost materials. Manago initially refused to discuss trial readiness and instead tried to argue with the judge over his ruling on the motion to dismiss. Eventually, Manago refused to waive time, and the judge set this case for a trial readiness conference.

> b. *The court agrees to switch the order of the cases*

At the conference on September 17, Manago said he wasn't ready for trial but also wasn't willing to waive time. Judge Camber explained how the right to a speedy trial

15

worked and told Manago that if he wasn't willing to waive time, he would have to keep bringing him back to court every few days to see if he was ready. Noting he wasn't advising him on how to proceed, the judge said he understood if Manago needed more time to prepare for his case, given the work product and new investigator, and explained that entering a waiver was the most effective way to do so. "Do you understand that? I'm not forcing you. I'm not telling you you have to answer ready. In fact, if I was you, I wouldn't answer ready until I was ready. . . . But you're the one that has to [keep] com[ing] back." The judge reminded Manago that the 60 days from his previous waiver was up the following week, on September 24, "[a]nd unless [you] answer[] ready that day, we're going to have to figure out when we're coming back. Potentially we could go day to day."

In response, Manago again tried to convince the judge to try the domestic violence case first. He promised he could be ready on that case much sooner than he could on this one. He claimed there was a lot of investigation left to do on this case, whereas he'd finished the investigation on the domestic violence case and could "take that case to trial ASAP." He said that all his first investigator had done "was interview the two females that was in my vehicle on the day of the alleged vehicle pursuit," and a lot more work needed to be done on this case, including "a lot of interviews of the CHP" regarding their involvement in the pursuit.

Unmoved, Judge Camber told Manago to focus on the evasion case, saying they would reconvene on September 24, the last of the 60 days, to see if he was ready. He

16

reiterated that he understood if Manago wasn't ready to go to trial on the 24th and would find good cause if he asked for a continuance.

Changing his approach, Manago said he would agree to waive time on this case but was unwilling to do so on the domestic violence case. Reiterating the point that his investigation was essentially finished on the domestic violence case, he claimed he was nearly certain he'd be ready to go to trial on that case on September 24. He claimed he was in possession of strong exculpatory evidence in that case. After much discussion—and based on Manago's repeated representations that he wasn't "playing games" and would be ready to go to trial on the domestic violence case by the next hearing—Judge Camber agreed to switch the order and try that case first.

But on September 24 Manago said he wasn't ready for trial in the domestic violence case. Despite having just said the file from his first investigator was relevant to this case only, he now claimed to need it for the domestic violence case. He also said he wasn't ready because, "[a]s the Court know, my work product, has been in the prosecution team hands [for nearly a year]." Judge Camber responded he didn't "know" that, and Manago retorted, "I think you do know that. We had a hearing about it. It was on the record. Judge Stodghill was conducting an evidentiary hearing dating back to April 11th. Of course you know about that." Ignoring Manago's combative comments, the judge asked if he was willing to waive time on the domestic violence case since he was essentially saying he needed to conduct more investigation. Manago refused, quipping, "[j]ust bring me back."

17

The following day, Manago again said he wasn't ready for trial and wouldn't waive time, but he claimed he would be ready "as soon as my investigator serve all the witnesses."

On September 27, Manago gave the same response—that he wasn't ready because he was waiting for his investigator to finish serving subpoenas on his trial witnesses. The court replied, "Just so the record is clear, if you ask for a continuance, I'll give it to you. But you haven't asked for one so there's nothing for me to give," and Manago told the court to bring him back the next court day.

Before concluding the hearing, the court heard the City of Barstow's motion to quash 19 subpoenas Manago had served in the domestic violence case. The city attorney argued Manago's requests were overbroad and irrelevant, and that Manago had recently indicated he planned to subpoena the entire police department. He argued Manago was abusing the subpoena process and asked the court to quash the subpoenas and "appoint a public defender to help him with the procedural aspects of this case." Judge Camber quashed the majority of the subpoenas on the ground Manago failed to show the witnesses were material to his case (the domestic violence case), and the parties stipulated that all of the material witnesses would be on call for trial.

On September 30, Manago said he was still waiting for the investigator to finish serving the subpoenas but would likely be ready on October 11. When the prosecutor said he could be ready for trial within a week of that date, Manago changed course, claiming he wasn't ready because he was still waiting for his first investigator to send her files.

18

Judge Camber responded, "I'll call that investigator and say where is Mr. Manago's discovery because I signed an order giving her payment for that, and we haven't heard a thing. I'll call her myself." Manago agreed to come back on October 10 to discuss trial readiness and indicated he'd be ready after the ruling on his motion to suppress Lillian's statement to the police.

On October 10, Judge Camber continued the matter to October 18 to hear motions to quash subpoenas Manago had served on three San Bernardino County Superior Court judges and various employees of the district attorney's office and the San Bernardino Sheriff's Department.

On October 18, Judge Camber granted all of the motions to quash except for Sergeant Cahow, a deputy involved in the removal of Manago's work product, and one police officer (who was already on the prosecution's witness list). Manago told the court he wasn't ready for trial because his investigator hadn't finished serving his subpoenas, and Judge Camber explained why subpoena service wasn't a reason to answer not ready, that he should subpoena his trial witnesses after answering ready.

On October 22, Judge Camber told Manago his first investigator wanted to know whether she should send the file to the court or directly to him, and Manago agreed she could send them to him indirectly via the court. Manago then claimed he'd be ready for trial in the domestic violence case as soon as the court ruled on his motion to suppress Lillian's statement to the police and his motion to dismiss. He explained, "I just want the motions ruled on so that if I do have to go to the Court of Appeals, everything is properly

documented. After additional discussion, Manago reiterated that all he needed to be ready to go to trial was a ruling on those two motions. "[L]ike I am just basically trying to get the Court to commit, you know, on ruling on my motions. Because, like I say, that's pretty much the holdup is I want to secure the record and make sure I am not waiving none of my constitutional rights." The court agreed to hear the motions on October 25 with the understanding Manago would then answer ready.

c. *Hearing on the motion to suppress*

On October 25, the court held a hearing on the motion to suppress Lillian's statement to Officer Helms. On direct examination by the prosecutor, Officer Helms denied using any coercive tactics during his interview. He said on August 29, 2017, he'd responded to a report of a male-on-female assault at a park in Barstow and found bloody scissors on the ground next to a car that had been vandalized and was registered to Lillian. When he found and interviewed Lillian about two hours later she was injured and bleeding from a laceration on her lip and what appeared to be a stab wound on her arm. She told him Manago had gotten physical with her during an argument.

At the continued hearing on October 31, the prosecutor offered Lillian immunity to testify in support of Manago's suppression motion. Lillian rejected the offer, but Judge Camber accepted the prosecutor's representation of immunity and ordered her to testify. Manago objected. He asked the judge to continue the hearing to give him time to review the immunity agreement. Judge Camber told Manago he lacked standing to challenge the agreement. He invited Manago to examine Lillian, reminding him that she was his

20

witness and that he'd been trying to present her testimony for months. Manago replied, "I have questions, but I'm not going ask her questions when the [prosecutor] is doing underhanded things." Judge Camber said he was taking that comment to mean Manago had no questions for his own witness, and Manago retorted, "No. I didn't say that. You said that."

d.      *Warning and revocation of pro per status*

At that point, Judge Camber warned Manago he was in danger of losing his right to represent himself, that his conduct was "obstructionist and delaying" and would no longer be tolerated. "From the time that you became a pro per, . . . you have filed at least one motion a week [on both cases]. I would say in each of your cases, there's probably 50 motions that have been filed. [¶] This case has dragged on for over two years and here we are. Now you file a motion, and you don't want to ask any questions of the witness because you claim you're being mistreated by the District Attorney. I disagree." Judge Camber warned Manago that if he continued his dilatory behavior and was unwilling to answer ready for trial, he would revoke his propria persona (pro per) status and appoint an attorney to represent him.

When Manago indicated he understood the warning, Judge Camber resumed the suppression hearing. Manago refused to call Lillian as a witness. He tried to call other witnesses but failed to convince the judge of their relevance. After hearing argument, the judge denied the motion, heard and denied Manago's remaining motions to dismiss, and

21

asked Manago if he was ready for trial. Manago replied, "Not at this time, your Honor. I would like to file a [motion to disqualify you] for cause."

Judge Camber said he'd rule on that motion when Manago filed it and proceeded to issue a second *Faretta* warning. "[A]t this point, I'm very close to revoking your pro per status, but I think you have to have notice of that. I'm going to bring you back next Friday. If you continue to say that you're not ready *and you're not going to waive time*, I'm going to revoke your pro per status." (Italics added.) After Judge Camber concluded the hearing, Manago tried to argue with him, saying "Do you remember you told me on the record you said that if I'm not ready don't answer ready prematurely?"

On November 8, 2019, Judge Camber asked Manago if he was ready and he replied, "No, your Honor." Judge Camber revoked Manago's pro per status on the ground he was engaging in intentionally dilatory and obstructive conduct by inundating the court with motions and manipulating the right to speedy trial. He observed that during his nearly two years of self-representation, Manago had "filed in excess of fifty motions in each case," the vast majority of which were frivolous and which "consumed numerous hours of court time and require responses from attorneys representing three law enforcement agencies, the District Attorney's Office, the Attorney General's Office, and the Superior Court."

In addition, Judge Camber found Manago was playing games with the timing of his two cases by agreeing to a continuance in one but not the other, then forcing the court to recall the domestic violence case "every few days." He concluded Manago's conduct

22

had "led to a serious disruption in the Court's ability to conduct other business and the People's ability to be ready for trial" and that "allowing [him] to continue to represent himself in these two matters would threaten the core integrity of the trial process."

After trial and entry of judgment in this case, Manago filed this timely appeal.

## II

## ANALYSIS

A.      *Revocation of Self-Represented Status*

Manago argues the court revoked his right to represent himself without sufficient justification. We disagree.

The Sixth and Fourteenth Amendments give criminal defendants the right to represent themselves, but the right is not absolute. (*Faretta*, *supra*, 422 U.S. 807; *People v. Williams* (2013) 58 Cal.4th 197, 252 (*Williams*).) At times, the "government's interest in ensuring the integrity and efficiency of the trial . . . outweighs the defendant's interest in acting as his own lawyer." (*Williams*, at p. 253.) For example, a prerequisite of self-representation is a willingness and ability "to abide by rules of procedure and courtroom protocol." (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 173.)

"The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, a trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-

23

representation." (*Williams*, *supra*, 58 Cal.4th at p. 253, [cleaned up].) As *Faretta* itself made clear, a court is justified revoking a defendant's pro per status when they have "deliberately engage[d] in serious and obstructionist misconduct." (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46.) "This rule is obviously critical to the viable functioning of the courtroom. A constantly disruptive defendant who represents himself . . . would have the capacity to bring his trial to a standstill." (*People v. Welch* (1999) 20 Cal.4th 701, 734 (*Welch*).)

"The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation," and we will not overturn that decision "'in the absence of a strong showing of clear abuse.'" (*Welch*, *supra*, 20 Cal.4th at p. 735.) We accord great deference to the trial court's "assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial." (*People v. Carson* (2005) 35 Cal.4th 1, 12.) This is because "the extent of a defendant's disruptive behavior may not be fully evident from the cold record," and the trial judge "is in the best position to judge [their] demeanor." (*Welch*, at p. 735.)

Having carefully reviewed the record, we find ample support for the court's determination that Manago was deliberately engaging in disruptive conduct to delay trial in both his cases. As is obvious from the trial evidence summarized above, this was a straightforward evasion case with uncomplicated facts. Where it would likely have taken the average attorney less than a year to prepare for trial, Manago spent nearly two years

24

inundating the court with frivolous and repetitive motions in lieu of conducting a relevant investigation. (See, e.g., *People v. Elliott* (1977) 70 Cal.App.3d 984, 990 [pro per defendants are held to the same rules and standards as counsel].) On that basis alone, the court would have been justified in finding he was trying to delay trial. (See, e.g., (*Williams*, 58 Cal.4th at p. 255 [revocation for dilatory conduct justified where defendant "missed the ready-for-trial deadline by five months" during which time he failed to "conduct any meaningful investigation"].) As the People aptly point out, the amount of court and agency resources that Manago's pretrial motions consumed rivals that of a death penalty case.

Describing his motions as merely indicative of "vigorous advocacy," Manago relies on *People v. Becerra* (2016) 63 Cal.4th 511 (*Becerra*) to argue the judge was wrong to revoke his pro per status because discovery was incomplete. Specifically, he argues he was justified in refusing to answer ready on the domestic violence case until he received the file from his first investigator.

The problem with this argument is that it's at odds with the record. The missing file was not the reason Manago refused to answer ready for trial in the domestic violence case. In fact, far from being a reason to delay trial, Manago cited the file as one of the reason's the judge should switch the order of the cases and try the domestic violence case first. At the hearing on September 17, he told the judge he needed the file only for the evasion case and had finished his investigation in the domestic violence case. He claimed

the only thing the first investigator had done was interview the two women who had been in the car with him during the pursuit.

We think the record shows that Manago's actual reason for refusing to answer ready or waive time in the domestic violence case was his dissatisfaction over the outcome of his motion to suppress Lillian's statement to the police, not any concern over incomplete discovery. Though he never gave the judge consistent or reasonable answers as to why he wouldn't answer ready or waive time, his conduct got worse during the suppression hearing when it became clear he wasn't going to be able to control its outcome. First, he refused to ask questions of his own witness (despite asking for months to be able to examine her) when the judge didn't allow him to challenge Lillian's immunity agreement. Then, he essentially shut down after the judge denied the motion, refusing to answer ready but also refusing to explain why. Given this was the trial he had pushed so hard to have go first, one he claimed to be ready for, the judge could reasonably conclude Manago was engaged in gamesmanship and had no intention of actually preparing for or going to trial.

But even if the missing file *had* been his reason for refusing to answer ready for trial on the domestic violence case, *Becerra* still wouldn't help his case. In that case, the trial court terminated Becerra's pro per status in response to his request for a continuance, without any prior warning, based on its finding that he was "stalling" and "everything [he'd] done [was] dilatory." (*Becerra*, *supra*, 63 Cal.4th at p. 516.) Our Supreme Court concluded that finding was "bereft" of support because the record revealed that Becerra

26

was justifiably waiting for discovery the prosecutor had acknowledged was outstanding. (*Id.* at pp. 515-516, 520.) The Court acknowledged that while "a mere desire for more time, a need to study the law in detail, or alleged inadequacies in the jail library will seldom be sufficient to entitle [a pro per defendant] to a continuance," incomplete discovery is a valid reason to seek a continuance. (*Id.* at p. 519.) The Court reversed Becerra's death sentence based on the error, explaining that "[t]erminating a defendant's self-representation status should be considered a last resort, not a first impulse." (*Id.* at p. 520.)

That case is readily distinguishable on the ground that what Becerra had requested there is precisely what the court kept offering Manago—a continuance to prepare for trial. Unlike Becerra, Manago refused a continuance even though the court repeatedly told him he had good reason to ask for one. As we've seen, Judge Camber went to great lengths to help Manago obtain the missing file and offered on numerous occasions to grant him a continuance to complete his investigation, but Manago repeatedly refused that option. Instead, when the case he claimed to be ready on didn't go the way he'd planned, he changed course and claimed he was no longer ready. That's gamesmanship and dilatory conduct, and it's grounds for revocation. (See *People v. Clark* (1992) 3 Cal.4th 41, 115 ["Trial courts are not required to engage in game playing with cunning defendants who would present Hobson's choices"].)

Finally, unlike in *Becerra*, revocation was not the court's "first impulse." Both Judge Stodghill and Judge Camber were extremely respectful of and patient with

27

Manago. They gave him multiple warnings about his excessive frivolous motions and disruptive behavior, and Judge Camber warned him twice that his pro per status was in peril and why. On this record, revocation was entirely avoidable and justified.

B. *Pitchess* Hearings

The court conducted two in-camera *Pitchess* hearings—one on May 11, 2018 and one on November 29, 2018—and found no records subject to disclosure. At Manago's request, which the People do not oppose, we have reviewed the sealed transcripts of those hearings for an abuse of discretion and found none. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228.)

### III

### DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

28