Filed 6/27/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S065573 |
| v. | ) | |
| | ) | |
| FRANK KALIL BECERRA, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Sup. Ct. No. BA 106878 |
| _____ | ) | |

Defendant Frank Kalil Becerra was convicted by jury of the first degree murders of James Harding and Herman Jackson,[1] with the special circumstance of multiple murders.[2]  He was also convicted of first degree burglary with use of a knife[3] and assault causing great bodily injury on George McPherson.[4]  The jury returned a verdict of death, which the court imposed,[5] along with seven years in

---

[1]     Penal Code sections 187, subdivision (a), and 189.  All further statutory references are to the Penal Code, unless otherwise noted.

[2]     Section 190.2, subdivision (a)(3).

[3]     Sections 459 and 12022.5, subdivision (a).

[4]     Section 245, subdivision (a)(1).

[5]     Section 190.4, subdivision (e).

1

prison for the first degree burglary and enhancement.  The assault sentence was stayed.[6]

In this automatic appeal, defendant contends the trial court erroneously terminated his right to self-representation in violation of the Sixth and Fourteenth Amendments to the federal Constitution.  (See *Faretta v. California* (1975) 422 U.S. 806, 807, 835 (*Faretta*).)  We agree.  The court's rationale, that defendant had been "dilatory" and had been "stalling," is not supported by the record. *Faretta* and its progeny require reversal of the judgment in its entirety.

## I.  BACKGROUND

On December 28, 1994, Harding and Jackson were found bound to each other and strangled to death with electrical cords in Harding's room at the Pacific Grand Hotel, a residential hotel in downtown Los Angeles where drugs were routinely bought and sold.  Defendant, an admitted drug dealer and gang member, had repeatedly threatened to kill Harding in a dispute over a bag of missing cocaine.  A few days before the murders, defendant forced his way into McPherson's room and held a knife to McPherson's neck while demanding to know where his "stuff" was.  Because resolution of defendant's appeal turns exclusively on his *Faretta* claim, we focus solely on facts germane to that contention.

In April 1995, before his preliminary hearing, defendant moved unsuccessfully to replace his public defender, Gregory Fisher.  In May, still awaiting his preliminary hearing, defendant asked to represent himself, adding that he was acting as his own counsel in another, unrelated criminal case.  The court granted his *Faretta* request.  It directed the public defender to turn over his

---

[6]     Section 654.

2

records, approved funds for an investigator[7] and supplies, and set a June date for defendant's discovery motion. Fisher informed the court he had already given defendant copies of all reports except the victims' rap sheets and would turn over any additional discovery.

At the June discovery hearing, defendant requested a postponement, claiming he had not yet received a complete copy of the prosecution's murder book[8] from his investigator. The court concluded defendant could proceed with an additional 73 discovery requests. On the record but outside the court's presence, the prosecutor and defendant discussed each request. In most instances, the prosecutor explained the items were either contained in the murder book, had been given to defendant's previous counsel, or did not exist. As to many requests, the prosecutor told defendant just where the information could be found in the murder book. With consent of the parties, the court continued the matter to July to set a preliminary hearing.

In July, the prosecutor declared he was "available any day" for the preliminary hearing. Defendant, however, requested additional discovery, claiming an inventory of the material he had been given revealed "a lot" of items were missing, as detailed in his compliance motion. The prosecutor responded he had turned over "a complete and true copy of the murder book" to defendant's previous counsel. He did not otherwise speak to the contention that "a lot" of defendant's requested discovery items had not been turned over. The court

---

[7]    Defendant specifically requested that John Jensen be appointed as his case investigator; the court acceded to this request.

[8]    A " 'murder book' " typically "is a notebook or file compiled by law enforcement and the prosecution that contains investigative reports, witness statements, photographs, audio and videotape recordings, and other material related to the case." (*People v. Carson* (2005) 35 Cal.4th 1, 12, fn. 3 (*Carson*).)

directed defendant's investigator to ascertain "all the matters" that defendant was seeking, meet with the prosecutor to secure them, and then deliver them to defendant. If problems arose, they were to notify the clerk so the court could intervene. The court also directed the parties to cooperate so the preliminary hearing could be set in August.

At the August hearing, the prosecutor reported that he and defendant's investigator had gone through the murder book "page by page by page, literally through the entire murder book. [¶] *There were some documents Mr. Jensen did not have that I copied and gave to him.* He gave me the further request for discovery; one being request for receipt by fax [of] rap sheets for approximately 25 witnesses." (Italics added.) *The process of checking those records had not been completed.* "Other than that, I believe that all the discovery Mr. Jensen asked of me has been provided" *except* for the audio tapes, which were in the process of being reproduced. The prosecutor said he would notify Jensen in three or four days when the tapes were ready. After addressing several subpoena issues with the court, defendant identified additional discovery items he claimed were still missing. The prosecutor did not object to the requests, nor did the court rule that defendant was not entitled to the items mentioned. Instead, the court set an additional hearing date, explaining, "I want to make sure *that you have all those things* before we go ahead with the prelim. [¶] Approximately 30 days from today's date? Will that be enough time, or do you need more time?" (Italics added.) Defendant responded, "Yeah, that is fine," and the parties agreed to meet on September 28 to set the preliminary hearing.

At the September hearing, however, the court opened the proceedings by terminating defendant's self-representation during the following exchange, without any record of prior warning or discussion:

4

"The Court: I gave you pro per privileges a little over four months ago and you continued this case on at least six occasions. The Court finds that everything you've done is dilatory; that this case is never going to get off the ground; that the prelim will never occur; and that all you're doing is stalling. Eventually it's going to have to happen. [¶] I don't want to hear from you anymore.

"[Defendant]: Your Honor?

"The Court: I'm telling you to be quiet. I'm releaving [*sic*] you. I'm reappointing the public defender's office and you can talk to —

"[Defendant]: Well, your Honor — I would like to say one thing for the record.

"The Court: Say it.

"[Defendant]: Okay. First of all, your Honor, this is a capit[a]l case one. I been appointed since May 19 of 1995. I don't have, since May till now, enough time to have enough season [*sic*] of the law to present my preliminary hearing in front of this Court. [¶] As you can see from the advisory counsel motion that I submitted to this Court on my last court appearance, it states a lot of the material that's missing from the law library. There's no Evidence Code books, Jeffersons, talks about the law. [¶] This is a capit[a]l case and you're dealing with my life. I've dealt with Mr. Fisher prior to this. Me and Mr. Fisher do not get along, and this is one of the reasons I took charge of my case is so I can do my investigation because ever since Mr. Fisher was appointed — since December, he hasn't done nothing. And since I been working from the — with the Jensens, I done a lot of investigations and ready to do my prelim, but I need time to understand the law. As to the admissibility of hearsay evidence, the admissibility of — of evidence that's going to be introduced by the district attorney. This is a capit[a]l case, your Honor. This is not a petty theft with a prior. This is a double murder case. [¶]

. . . [¶] . . . [¶] . . . [¶] I have the constitutional right to represent myself . . . I'm entitled to an advisory counsel, your Honor.

"The Court: You made your record. I made my ruling.

"[Defendant]: I haven't done nothing to take this privilege away from me. You're taking my constitutional rights from me and that is a reversible error in [sic] your part. And I'm going to take this on a writ. And if this is all you have to say, this is all I have to say. I'll take this . . . up on a writ. You're not going to take my constitutional rights when I have the rights to represent myself. This is my life, your Honor. You're dealing with my life.

"The Court: That will be all. [¶] . . . [¶]

"[Defendant]: I hope Mr. Fisher doesn't come to the jail and visit me. That, hopefully, is for the record. I do not get along with him."

Defendant ended by telling the court: "You want to fuck with me, I'll fuck with you." After a short pause in the record, the prosecutor described how an enraged defendant had thrown four or five sharpened pencils at Fisher before being removed from the courtroom. The prosecutor indicated an intention to file an assault charge based on that behavior. In defendant's absence, the court set the next hearing for November, stating, "[b]ecause of . . . what the defendant displayed about five minutes ago . . . I simply do not feel that this court would be a safe place and have him out here at the same time."

Fisher was reinstated as defendant's counsel. At a hearing two weeks later, defendant requested to resume self-representation and asserted there was still outstanding discovery that he needed. Even so, he argued that, rather than terminating his *Faretta* status, the court should have denied his request for a continuance and proceeded with the preliminary hearing. The court affirmed its ruling, stating, "When I granted you pro per status, I did it with the understanding that you act as any other attorney would act, and that this Court would give you no

6

special indulgences, and that you would follow the rules and substantive law. [¶] The case was put over an incredible amount of times. The Court felt that you were dilatory." A few days later, defendant renewed the request for self-representation, stating he would be ready to proceed with the preliminary hearing in 30 days. The renewed request was denied.

## II. DISCUSSION

The United States Supreme Court has held the Sixth Amendment to the federal Constitution gives a defendant the right to self-representation. (*Faretta, supra*, 422 U.S. at pp. 807, 819.) That right is not without limits, however. (*Indiana v. Edwards* (2008) 554 U.S. 164, 171.) " '[The] government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' " (*People v. Williams* (2013) 58 Cal.4th 197, 253; see also *Faretta,* at pp. 834-835, fn. 46.) In *Carson*, we held that a trial court may terminate the pro per status of a defendant who engages in " 'deliberate dilatory or obstructive behavior' " that "threatens to subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial," (*Carson*, *supra*, 35 Cal.4th at p. 10), but added that "[t]ermination of the right of self-representation is a severe sanction and must not be imposed lightly" (*id*. at p. 7).

"When determining whether termination is necessary and appropriate, the trial court should consider several factors in addition to the nature of the misconduct and its impact on the trial proceedings," including: (1) "the availability and suitability of alternative sanctions," (2) "whether the defendant has been warned that particular misconduct will result in termination of in propria persona status," and (3) "whether the defendant has 'intentionally sought to disrupt and delay his trial.' " (*Carson, supra,* 35 Cal.4th at p. 10.) A record of the basis for terminating a defendant's *Faretta* rights should include "the precise

7

misconduct on which the trial court based the decision to terminate. [Citation.] The court should also explain how the misconduct threatened to impair the core integrity of the trial. Did the court also rely on antecedent misconduct and, if so, what and why? Did any of the misconduct occur while the defendant was represented by counsel? If so, what is the relation to the defendant's self-representation? Additionally, was the defendant warned such misconduct might forfeit his *Faretta* rights? Were other sanctions available? If so, why were they inadequate?" (*Id.* at pp. 11-12, fn. omitted.)

On review, we accord "due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial in determining whether termination of *Faretta* rights is necessary to maintain the fairness of the proceedings." (*Carson, supra*, 35 Cal.4th at p. 12.) The court exercises considerable discretion in this regard and "the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' " (*People v. Welch* (1999) 20 Cal.4th 701, 735.)

In *Carson* we emphasized the necessity of providing an adequate record to justify terminating a defendant's self-representation status. (*Carson, supra,* 35 Cal.4th at pp. 11-12.) We do so again here. Ruling on a *Faretta* motion and deciding whether to terminate a defendant's pro per status present a trial court with particular complexities. A defendant's request to proceed pro per must be unequivocal, voluntary, and intelligent. Often, defendants make a self-representation motion in the heat of the moment, after a different motion has been denied. No matter how extensive the court's explanation of a defendant's options and responsibilities, a defendant may not have a clear picture of how challenging self-representation can be. Once a defendant has had a reasonable opportunity to prepare, a mere desire for more time, a need to study the law in detail, or alleged

8

inadequacies in the jail library will seldom be sufficient to entitle him to a continuance.[9]  Incomplete discovery, however, is a different matter.

While we review a *Faretta* revocation order for abuse of discretion, it is incumbent upon the court to create a record that permits meaningful review of the basis for its rulings.  As we explained in *Carson*, when terminating self-representation, the trial court must "preserve a chronology of relevant events for possible appellate review" and "document its decision . . . with some evidence reasonably supporting a finding that the defendant's obstructive behavior seriously threatens the core integrity of the trial."  (*Carson, supra,* 35 Cal.4th at p. 11.)

Here, although the court said defendant had been dilatory, the record does not contain factual support for this finding.  There is no evidence before us to demonstrate defendant's discovery requests were made in bad faith or intended to cause delay.  The court did not otherwise make clear how defendant's behavior threatened to compromise its ability to conduct a fair trial.  The prosecution did not complain about the pace of the proceedings, nor does the record reflect any warning to defendant about his conduct or the court's consideration of alternate sanctions.  It appears some of defendant's discovery requests were extensive, but the prosecutor never objected that any of the items defendant requested were not properly discoverable.  Indeed, the prosecutor repeatedly acknowledged that items remained outstanding and that discovery had yet to be fully completed by the August hearing.

The most challenging aspects of the case on review, however, are the abruptness of the trial court's action, its initial ruling without giving defendant an

---

**9**    Even if a continuance is unwarranted, however, the question of whether to revoke a defendant's *Faretta* status must be separately evaluated, applying the standards set out here.

9

opportunity to be heard, and the failure to explain how it concluded defendant had been dilatory. Terminating a defendant's self-representation status should be considered a last resort, not a first impulse. If the court thought enough time had been spent sorting out discovery, that the outstanding items were unnecessary for the preliminary hearing, that defendant was stalling for tactical advantage, or that defendant needed to work with his investigator and be ready for the hearing by a date certain, the court should have said so on the record before taking dispositive action. Instead, the court took a hands-off approach to discovery. It did not make any ruling on the propriety of defendant's discovery requests. It granted several continuances, asking defendant if he needed more time and continuing the matter for setting dates "to make sure [he] had all those things before we go ahead with the prelim." It then abruptly terminated defendant's pro per status without ever expressing a concern that defendant was "stalling" or warning of potential adverse consequences. The stated reason for this action, defendant's dilatoriness, is not manifest in the record.

It is possible something occurred before the final hearing that tried the court's patience. But if so, an adequate record is required to facilitate meaningful review. This is no mere technicality but an important mechanism to protect defendant's constitutional guarantee. To be sure, defendant's subsequent threats to the court and his assault on counsel were most inappropriate. The court, however, had already made up its mind and issued its termination ruling. This subsequent misconduct, no matter how serious, cannot shore up an unsupported ruling that had already taken place. (See, e.g., *Moon v. Superior Court* (2005) 134 Cal.App.4th 1521, 1530-1531 [rejecting argument that the defendant's disruptive behavior, prompted by anger when he was not allowed to represent himself, could be used to justify denying his request for self-representation in the first place].)

Even after its ruling the court did not refer to defendant's outburst as indicative of other behavior that the court had failed to mention earlier.

"Erroneous denial of a *Faretta* motion is reversible per se. [Citations.] The same standard applies to erroneous revocation of pro. per. status." (*People v. Butler* (2009) 47 Cal.4th 814, 824-825.) As in *Butler*, "[w]e decide this case under compulsion of United States Supreme Court precedent" and "prevailing constitutional standards." (*Id.* at p. 829.) The record before us is bereft of information to support the trial court's revocation of defendant's pro per status. In such a circumstance, controlling precedent compels this result.

## III. DISPOSITION

The judgment is reversed.

CORRIGAN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

11

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Becerra

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S065573
**Date Filed:** June 27, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** J. D. Smith

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Alison Bernstein, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alison Bernstein
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Susan S. Kim
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 620-6449