Filed 1/16/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TREVON MARCUS BEY,<br><br>    Defendant and Appellant. | B335964<br><br>(Los Angeles County<br>Super. Ct. No. YA105707) |

    APPEAL from a judgment of the Superior Court of Los Angeles County.  Scott T. Millington, Judge.  Modified and affirmed with directions.

    Lenore O. De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

    Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Taylor Nguyen and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Trevon Bey appeals the judgment entered following a jury trial in which he was convicted as charged of possession of a firearm by a felon (Pen. Code,[1] § 29800, subd. (a)(1); count 1) and carrying a loaded firearm in public (§ 25850, subd. (a); count 2). The trial court granted appellant's *Romero*[2] motion and dismissed a prior strike conviction allegation. (§§ 667, subds. (b)–(j), 1170.12, subds. (a)–(d).) Finding true the alleged aggravating factor under California Rules of Court, rule 4.421(b)(3), the court sentenced appellant to the upper term of three years on count 1 with a concurrent term of three years on count 2.

Appellant contends: (1) The trial court abused its discretion by revoking appellant's propria persona status without proper cause; (2) Appellant's conviction under section 29800, subdivision (a)(1) (felon in possession of a firearm) violated his Second Amendment rights; and (3) California's concealed carry license laws are unconstitutional under *New York State Rifle & Pistol Ass'n v. Bruen* (2022) 597 U.S. 1, 10 [142 S.Ct. 2111, 213 L.Ed.2d 387] (*Bruen*), making appellant's conviction for carrying a loaded firearm in public (§ 25850) invalid. We disagree and affirm.

Appellant further contends and the People agree that appellant's sentence on count 2 should be stayed pursuant to section 654. We accept the parties' agreement, and modify the judgment to stay the sentence on count 2 in accordance with section 654.

---

[1] Undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

## FACTUAL BACKGROUND

On May 5, 2022, Los Angeles County Sheriff's deputies observed appellant get into a car with illegally tinted windows. The car was parked in the public parking lot of a strip mall. When he sat down in the car, appellant removed a satchel he had been wearing around his chest. The deputies approached, and ultimately detained appellant. A search of the satchel turned up a "ghost gun"—a green and black nine-millimeter Polymer 80 firearm with no serial number or any identifying features. The gun was loaded.

## DISCUSSION

### I. The Trial Court Did Not Abuse Its Discretion by Revoking Appellant's Propria Persona Status

#### A. *Relevant background*

Prior to the preliminary hearing, the superior court granted appellant's request to proceed in propria persona, but advised appellant that "self-representation is almost always an unwise choice," and he would "be held to the same standards of conduct as an attorney." Thereafter, appellant represented himself at the preliminary hearing and throughout the pretrial proceedings.

On August 1, 2023, appellant made his first appearance in the trial court and filed a motion to dismiss pursuant to rule 12(b)(2) of the Federal Rules of Criminal Procedure. Appellant offered no argument on the motion, but advised the court he did not understand the nature and cause of the charges against him, and objected to the prior court's entry of a not guilty plea on his behalf. The trial court explained the charges and reminded appellant that if he was going to proceed in propria persona, he would be presumed to understand the law. He would not receive any special treatment, and would be treated like any attorney

appearing before the court.  Appellant declined the court's offer to appoint counsel for him, and the trial court denied appellant's motion to dismiss.

Appellant charged the court with cutting him off.  The court responded, "I'm telling you right now if you're disrespectful to this court, I'll terminate your pro per status.  You must treat the court with respect, all right?  You submitted on [your motion].  Maybe you didn't know what you did, but that's what you did."

Appellant asked if the court had made a judicial determination to deny him his right to represent himself.  The court responded that appellant could represent himself, but as a precaution, reminded appellant that he had a right to appointed counsel free of charge but no right to advisory counsel, "self-representation is almost always unwise," the prosecution was represented by a trained professional, and appellant could not later claim he had received ineffective assistance of counsel. Appellant stated that he understood these caveats.  The trial court added, "You will receive no special indulgence by this court, and you are required to follow all the technical rules of substantive law, criminal procedure and evidence in making motions and objections, presenting evidence and argument and conducting voir dire."  Appellant affirmed that he understood. Finally, the court admonished appellant, "I want to be very clear about this—you are being advised that any misbehavior or disruption could result in termination of your self-representation."  Appellant responded, "I'm clear."  The trial court reiterated, "So, again, any misbehavior or disruption, I will terminate your pro per status, and I'm not doing it now.  I'm telling you so we're on the same page."

At the hearing on appellant's section 995 motion to dismiss, appellant asserted that the charges should be dismissed for lack of probable cause, insufficient evidence, and violation of the corpus delicti rule. Appellant also complained that he still did not understand the nature and the cause of the charges against him. The court reviewed the evidence presented at the preliminary hearing and denied the motion to dismiss.

Appellant then charged that the court needed to answer his questions. The trial court stated it was not there to answer appellant's questions. The court again reminded appellant of the perils of proceeding in propria persona, reiterating that appellant would "receive no special indulgence by the court," and he was "required to follow all the technical rules of substantive law, criminal procedure and evidence in making motions and objections, presenting evidence and argument, and conducting voir dire." Appellant stated he would continue to represent himself.

The trial court asked appellant if he wanted to proceed to trial or continue the matter. Appellant responded, "A trial can't happen with no injured party." He then "demand[ed] proof of [the judge's] oath of office to appear on the record," which the court refused. Declaring that the court was denying him due process, appellant continued to interrupt and argue with the court. Again, the court reminded appellant that if he misbehaved or was disruptive it would terminate his propria persona status.

Before jury selection on October 25, 2023, appellant confirmed he wanted to continue representing himself and was ready for trial. Appellant then complained that the People's trial brief as well as the opposition to the motion to dismiss were lacking signatures and should not have been accepted. The court

stated it had already ruled on the motion to dismiss, and appellant responded, "So you ruled on something that was incomplete?"  The court warned appellant that when the jury came in, he was not to speak to the court in that manner.  Appellant protested he was being denied due process.

Appellant proceeded to assert that the jury instructions the court had provided him were incomplete.  The court explained that the instructions were not complete because it had not yet heard the evidence in the case, and it had provided these "potential" instructions as a courtesy to give appellant an idea of what instructions might apply.  Appellant replied, "I think the better courtesy would be to give the full instruction."  The court admonished appellant, "Don't tell me how to run my court."

Moving on, appellant said, "My next thing is that the — and I'm anticipating getting cut off right now."  The court responded, "Sir, don't insult me."  Appellant again asserted a violation of the corpus delicti rule and complained that the trial court had not established it had jurisdiction over his case or placed its oath of office on the record.  The court explained the basis for its subject matter jurisdiction and personal jurisdiction over appellant, but appellant reasserted that the court lacked jurisdiction and could not proceed.  Appellant continued to argue, and the court responded, "Sir, do not cut me off.  I am telling you right now you are precluded from asking any questions about jurisdiction other than did this occur in the County of Los Angeles.  If you do, I will sustain the objection.  If you continue to ask the questions, I will revoke your pro per status because that shows me you cannot follow the rules of the court."  Appellant again asserted he was being denied due process.

During voir dire, the trial court advised the prospective jurors that appellant had pleaded not guilty to the charges. Appellant objected, announcing in front of the jury, "I did not plead not guilty." "The court put that in, not me." The court admonished appellant not to interrupt the court during jury selection. Later during voir dire the court told a woman with a child in the audience that she would have to leave the courtroom if the child could not be quiet. Appellant stated, "That's my wife and family." The court told appellant not to speak up.

During appellant's questioning of the jury venire, appellant asked Juror No. 1 multiple questions about whether and to what extent the juror agreed with certain statements and why. After appellant confirmed he intended to ask each prospective juror the same questions, the court told appellant to shorten his questioning, and ask his questions more generally. Appellant then posed the following question to Juror No. 1: "A defendant should only be convicted of a crime if it involves injury, harm, and loss to someone. What's your thoughts on that?" The juror answered, "That depends on the charge." Appellant asked, "Okay. Why do you feel that it depends on what the charge is?" The court called a sidebar.

At sidebar, the trial court told appellant it would not allow him to ask each juror the same questions that were not based on cause. Specifically, the court would not permit appellant to ask the last question related to injury, harm and loss to a person, because such questions that do not go to cause for excusing a juror are irrelevant. The court admonished appellant that he needed "to get to the point and ask questions that go for cause. I'm not going to give you four hours to ask . . . the same eight or six questions to all of [the jurors] that don't go for cause."

Appellant asserted the trial court was denying him due process by restricting the questions he could ask and challenged the court's authority to control his voir dire. The court told appellant to ask questions related to cause or it would stop his questioning. Appellant requested that a different judge preside over his case. The court denied the request and repeated that appellant was to ask questions for cause, reminding him that he decided to represent himself knowing he would get no special privileges.

When the prospective jurors returned, appellant announced, "For the record on the record the magistrate is denying me due process to ask questions." The following exchange then took place in front of the jury:

"THE COURT: I'll tell you not to put that on the record out here right now. I'm telling you not—

"[APPELLANT]: The court reporter is here. That's what you asked.

"THE COURT: Sir, I'll tell you not to put on the record—

"[APPELLANT]: The magistrate asked me not to ask you the question—

"THE COURT: I just told you not to do that.

"[APPELLANT]: He said in his opinion they do not go to the cause."

The trial court excused the jury for the day and addressed appellant: "For the record, the jury has exited the courtroom. . . . I'll stress it's very clear to this court [that] throughout the proceedings with [appellant] that he is disruptive, and I am very clear on this, that he will not follow the instructions of the court. I told him not to say that in front of the jury. He continues to say

8

it. Even in front of the jury when I asked him not to say it, he continued to say it."

The trial court then revoked appellant's propria persona status and appointed standby counsel to represent him. The court further warned appellant that if he continued to disrupt the proceedings, he would be excluded from the courtroom. The court concluded, "You are not going to be disrupting this court. I have found that you have been not following the court rules, so therefore your pro per status is revoked and [standby counsel] is going to represent you. That's the ruling."

The next day, appellant announced that he did not consent to representation by standby counsel and every order the court had made was void for lack of subject matter jurisdiction and unlawful activity by the judge. The trial court placed appellant in custody.

Shortly thereafter, appellant returned to the courtroom and the trial court made a full statement of its reasons for revoking appellant's propria persona status and appointing counsel to represent him against his wishes. Citing Penal Code section 1044 and Code of Civil Procedure section 128, the court declared it had the duty and the authority to control and enforce order in all proceedings in the case. The court then recited the instances of appellant's misconduct before the court and his inability to follow court rules, as well as the numerous advisements and warnings he had received about the consequences of such behavior. The court opined that appellant was attempting to garner sympathy from the jury when he blurted out that the woman and children in the courtroom were his family.

In conclusion, the court stated, "I have found clearly the [appellant] repeatedly was disrespectful of this court and that he

abused the dignity of the court. Furthermore, I found that [appellant] was unwilling and unable to abide by court protocol, and that his behavior indicated to me a high likelihood of further in-court disruptions and obstreperous behavior, and therefore there was no alternative remedy available to me other than to revoke his pro per status." The court noted that appellant's disregard for court orders and disruptive behavior, which he had demonstrated that day, further substantiated the court's decision.

With the resumption of trial, the trial court advised the jury that appellant was no longer representing himself, but was represented by counsel, and the jury was not to speculate about the reasons for the change.

**B.** *Applicable law*

The Sixth and Fourteenth Amendments of the federal Constitution give criminal defendants the right to self-representation. (*People v. Becerra* (2016) 63 Cal.4th 511, 517 (*Becerra*), citing *Faretta v. California* (1975) 422 U.S. 806, 807, 819 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*).) That right, however, is not absolute. (*Becerra*, at p. 518, citing *Indiana v. Edwards* (2008) 554 U.S. 164, 171 [128 S.Ct. 2379, 171 L.Ed.2d 345].) Indeed, courts have recognized that, at times, the " 'government's interest in ensuring the integrity and efficiency of the trial . . . outweighs the defendant's interest in acting as his own lawyer.' " (*People v. Williams* (2013) 58 Cal.4th 197, 253 (*Williams*), quoting *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 161 [120 S.Ct. 684, 145 L.Ed.2d 597].)

"A prerequisite of self-representation . . . is that the defendant be willing and able 'to abide by rules of procedure and

10

courtroom protocol.' " (*People v. Doss* (2014) 230 Cal.App.4th 46, 54–55.) As *Faretta* observed, "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Faretta, supra*, 422 U.S. at pp. 834–835, fn. 46; *Williams, supra*, 58 Cal.4th at p. 253.) Thus, the trial court may terminate self-representation if the defendant's " 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial.' " (*People v. Carson* (2005) 35 Cal.4th 1, 10 (*Carson*); *People v. Ng* (2022) 13 Cal.5th 448, 494 (*Ng*); *Becerra, supra,* 63 Cal.4th at p. 518; *Faretta*, at pp. 834–835, fn. 46 [trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct"].)

" 'When determining whether termination is necessary and appropriate, the trial court should consider several factors in addition to the nature of the misconduct and its impact on the trial proceedings,' including: (1) 'the availability and suitability of alternative sanctions,' (2) 'whether the defendant has been warned that particular misconduct will result in termination of in propria persona status,' and (3) 'whether the defendant has "intentionally sought to disrupt and delay his trial." ' [Citation.] The intention to disrupt and delay trial is, in many instances, sufficient to order termination." (*Ng, supra*, 13 Cal.5th at pp. 494–495; but see *Carson, supra,* 35 Cal.4th at pp. 10–11 [defendant's intent to disrupt is not a "necessary condition"; instead, "the relevance inheres in the effect of the misconduct on the trial proceedings, not the defendant's purpose"].) But no single consideration is dispositive; rather, the trial court's decision to terminate a defendant's self-representation will be

11

informed by the totality of circumstances. (*Carson, supra*, at p. 12.)

We review the trial court's decision to revoke a defendant's propria persona status for abuse of discretion. (*Carson, supra*, 35 Cal.4th at p. 12.) "The trial court has considerable discretion in determining whether termination of *Faretta* rights is necessary to maintain the integrity and fairness of proceedings." (*Ng, supra*, 13 Cal.5th at p. 495; *Becerra, supra*, 63 Cal.4th at p. 518.) We accord great deference to the trial court's "assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial." (*Carson*, at p. 12.) This is because "the extent of a defendant's disruptive behavior may not be fully evident from the cold record," and the trial judge "is in the best position to judge defendant's demeanor." (*People v. Welch* (1999) 20 Cal.4th 701, 735.) As our Supreme Court has admonished: "We have an obligation to interpret *Faretta* in a reasonable fashion to vindicate the legitimate rights of defendants while at the same time avoiding turning the trial into a charade in which a defendant can continually manipulate the proceedings in the hope of eventually injecting reversible error into the case no matter how the court rules." (*People v. Clark* (1992) 3 Cal.4th 41, 116 [overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462].) Thus, "[a] court's decision will not be disturbed absent a strong showing of clear abuse." (*Ng,* at p. 495; *Becerra,* at p. 518; *Welch,* at p. 735.)

**C.** *The trial court properly revoked appellant's propria persona status based on appellant's numerous disruptions, disrespectful remarks, and disregard for court rulings and protocol*

Appellant asserts that while "the behaviors and conduct the trial court identified might very well be characterized as 'annoying' or 'frustrating' or 'challenging' . . . they did not individually or taken together amount to 'serious and obstructionist' misconduct that threatened the trial proceedings" so as to justify revocation of appellant's propria persona status. To the contrary, as detailed above, in every appearance before the court in pretrial proceedings and during jury selection, appellant repeatedly challenged the court's authority, openly disrespected the court, disrupted and delayed the proceedings, and flagrantly disregarded court rulings. Despite multiple warnings from the court, not only did appellant consistently demonstrate his unwillingness to follow the basic rules of courtroom procedure, but his contempt for the court's authority became increasingly evident during voir dire. Indeed, by the time the court took the final step of terminating appellant's self-representation, appellant had openly defied the court's order (given three times) not to say to the jury that the court was "denying [him] due process to ask questions" because "in [the court's] opinion [the questions] do not go to the cause."

Under these circumstances, the trial court acted within the scope of its discretion in revoking appellant's propria persona status. Appellant placed the integrity of the entire trial in jeopardy by deliberately ignoring the court's rules and acting out in front of the prospective jury. No attorney would have been permitted to engage in such misconduct, and appellant received

repeated warnings that he must conduct himself in accordance with the rules and he would not receive special consideration by virtue of his propria persona status.

Appellant argues the court could have terminated appellant's conducting of voir dire rather than taking the extreme step of revoking his propria persona status to bring appellant's behavior under control. But appellant's pattern of disruptive conduct and disrespect for the court was only becoming more serious as the trial progressed, and showed no sign of abating. Moreover, appellant's blatant disregard of the court's order not to comment on the sidebar ruling in front of the jury demonstrated appellant's willingness to challenge the court's authority even in front of the jury. Such conduct not only impugned the integrity of the court, it also compromised the trial court's ability to conduct a fair trial, leaving the court no alternative but to revoke appellant's propria persona status. (See *Becerra, supra,* 63 Cal.4th at p. 518; *Carson, supra,* 35 Cal.4th at p. 10.)

In sum, as the trial court explained in great detail, appellant conducted himself in a manner that was both disrespectful to the court and disruptive to the proceedings; he had been repeatedly warned and was thus on notice that such conduct would result in termination of his self-representation; he appeared to be attempting to gain sympathy from the jury with his outbursts; and he openly defied court rulings and procedure. Viewed together, the instances and range of appellant's misconduct suggest an intentional effort to disrupt and delay the trial.

On this record, we find no abuse of discretion in the trial court's revocation of appellant's propria persona status and no violation of appellant's constitutional rights. (See *Faretta, supra,*

14

422 U.S. at pp. 834–835, fn. 46; *Williams, supra,* 58 Cal.4th at p. 255.)

## II. Appellant's Felon in Possession of a Firearm Conviction Does Not Violate His Second Amendment Rights

Appellant contends section 29800 violates the fundamental constitutional right to self-defense as embodied in the Second Amendment to the federal Constitution.[3]  Specifically, he asserts the statute prohibits conduct that is presumptively protected by the Second Amendment, and the government cannot establish that proscribing possession of firearms by felons who have served their terms of incarceration is consistent with historical tradition. Our review of appellant's claim is de novo.  (*Alexander, supra*, 91 Cal.App.5th at p. 474 [" 'The interpretation of a statute and the determination of its constitutionality are questions of law.  In such cases, appellate courts apply a de novo standard of review' "].)

Section 29800, subdivision (a)(1) prohibits any person who has been convicted of a felony to possess a firearm.  While we agree with appellant's assertion that this statute punishes conduct that is presumptively protected by the Second Amendment, we reject his contention that the prohibition is

---

[3] Appellant did not raise this claim below, but because the argument presents a facial challenge that requires us to "consider 'only the text of the measure itself, not its application to the particular circumstances of an individual' " (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474 (*Alexander*)), the argument is not forfeited (*People v. Anderson* (2024) 104 Cal.App.5th 577, 583–584 (*Anderson*) ["Such a challenge may be raised and decided for the first time on appeal"]).

15

inconsistent with historic tradition.  (See *Anderson, supra,* 104 Cal.App.5th at pp. 586, 588.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570, 635 [171 L.Ed.2d 637, 128 S.Ct. 2783] (*Heller*), the Supreme Court struck down the District of Columbia's prohibition on possessing usable handguns in the home.  However, while holding "that the Second Amendment conferred an individual right to keep and bear arms" (*id.* at p. 595), the court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" (*id.* at p. 626).  And as the high court emphasized, "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  (*Id.* at pp. 626–627.)

The Supreme Court struck down similar prohibitions on handgun possession in the home in *McDonald v. City of Chicago* (2010) 561 U.S. 742 [177 L.Ed.2d 894, 130 S.Ct. 3020] (*McDonald*), holding that the Second Amendment right recognized in *Heller* "applies equally to . . . the States" through the due process clause of the Fourteenth Amendment.  (*Id.* at p. 791.)  Again, the high court emphasized that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons,' " declaring, "[w]e repeat those assurances here."  (*Id.* at p. 786, quoting *Heller, supra,* 554 U.S. at pp. 626–627.)

In *Bruen*, *supra*, 597 U.S. at page 10, the Supreme Court considered the constitutionality of New York State's licensing regime to carry a handgun publicly for self-defense, and held,

16

"consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." However, unlike the 43 states in which "the government issues licenses to carry based on objective criteria," the court concluded that the State of New York's requirement that an applicant for a license to carry demonstrate "a special need for self-defense" did not pass constitutional muster. (*Id.* at p. 11.)

*Bruen* explained: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." (*Bruen, supra*, 597 U.S. at p. 17.) To meet this standard, the government may reason by analogy and need only "identify a well-established and representative historical *analogue*, not a historical *twin*." (*Id.* at p. 30.) "[A] historical regulation is a proper analogue for a distinctly modern firearm regulation" when it is " 'relevantly similar,' " in the sense that both "burden a law-abiding citizen's right to armed self-defense" in a similar way and for similar reasons. (*Id.* at pp. 28–29.)

But the Supreme Court recognized that "the Second Amendment is [not] a regulatory straightjacket" (*Bruen, supra*, 597 U.S. at p. 30) and stressed that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . licensing regimes" that "require applicants to undergo a background check or pass a firearms safety course" because these "are designed to ensure only that those bearing arms in the

17

jurisdiction are, in fact, 'law-abiding, responsible citizens.' " (*Id.* at pp. 38–39, fn. 9.)

Finally, in *United States v. Rahimi* (2024) 602 U.S. 680, 690–693 [144 S.Ct. 1889, 219 L.Ed.2d 351] (*Rahimi*) the Supreme Court applied its analysis from *Bruen* to reject a Second Amendment challenge to a federal statute (18 U.S.C. § 922(g)(8)) prohibiting possession of a firearm by a person subject to a domestic violence restraining order. Noting that recent Supreme Court precedents "were not meant to suggest a law trapped in amber" (*id.* at p. 691), the *Rahimi* court emphasized that to pass constitutional muster, a challenged regulation need not "be a 'dead ringer' or a 'historical twin' " to its historical precursors, but "must comport with the principles underlying the Second Amendment" (*id.* at p. 692). Thus, after reviewing firearm regulation under English and early American law, the *Rahimi* court concluded that these early regulations "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." (*Id.* at p. 698.) And "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " (*Id.* at p. 699, quoting *Heller, supra,* 554 U.S. at pp. 626–627, fn. 26.)

Against this backdrop of United States Supreme Court authority, California Courts of Appeal have consistently upheld section 29800 against constitutional challenge.[4]

In *Alexander*, *supra*, 91 Cal.App.5th at pages 473–474, the court applied the *Bruen* analytical framework to conclude that

---

[4] The California Supreme Court has not taken this issue for review.

California's statutes barring felons from possessing firearms (§ 29800, subd. (a)(1)) and ammunition (§ 30305, subd. (a)(1)) do not violate the Second Amendment. The court reasoned that the challenged conduct—possession of firearms and ammunition by felons—is not covered by the Second Amendment, "because according to *Heller* and *Bruen* only law-abiding citizens are included among 'the people' whose right to bear arms is protected by the Second Amendment." (*Alexander*, at p. 478; see also *id.* at pp. 478–479 [discussing the limitation of Second Amendment rights under *Heller* and *Bruen* to " ' "law-abiding, responsible citizens" ' "].) Convicted felons, *Alexander* held, are by definition, "not law abiding. Felons thus are not among 'the people' who have an individual right to possess firearms under the Second Amendment." (*Id.* at p. 479; see also *People v. Ceja* (2023) 94 Cal.App.5th 1296, 1301 [quoting and "agree[ing] with the cogent reasoning and analysis in *Alexander*"]; *People v. Odell* (2023) 92 Cal.App.5th 307, 316–317 ["People who have been convicted of a felony are not 'law-abiding,' " and are therefore not among the people entitled to bear arms under the Second Amendment]; *In re D.L.* (2023) 93 Cal.App.5th 144, 166 (*D.L.*) [agreeing with *Alexander* and *Odell* "that *Bruen* did not expand 'the categories of people who may lawfully possess a gun,' and that those convicted of a felony are squarely in a category where gun possession is off-limits due to their prior criminal conduct"].)

In *Anderson, supra*, 104 Cal.App.5th at pages 587–588, the Court of Appeal rejected the proposition that "*only* law-abiding, responsible citizens are among 'the people' covered by the text of the Second Amendment," but the court nevertheless upheld the constitutionality of section 29800 based on a rigorous analysis of "sources from 17th-century England, colonial America, and the

19

early federal period." (*Anderson*, at pp. 589, 589–595.) In light of this historical record, *Anderson* concluded that "California's felon-in-possession firearm regulations comport with our national tradition of firearm regulation. In that tradition, categories of persons thought to pose a danger to the community were forbidden to have arms, and individuals were sometimes disarmed as a consequence of being convicted of criminal conduct. When the founding generation framed and debated constitutional text, it considered such limitations inherent in the right the Second Amendment protects." (*Id.* at p. 589.)

As *Anderson* emphasized, "categorical disarmament laws are not inconsistent with the Second Amendment." (*Anderson, supra,* 104 Cal.App.5th at p. 598.) Indeed, "[the] historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence. California's felon disarmament measures are ' "relevantly similar" ' in serving both of these purposes." (*Ibid.*, quoting *Rahimi, supra*, 602 U.S. at p. 692.) "As with the criminal penalty of disarmament, section 29800 deprives an individual of weapons only after he or she has been convicted in a court of law, with all the attendant protections of due process." (*Anderson*, at p. 598.)

We agree with the *Anderson* court's reasoning and its conclusion that, under recent United States Supreme Court precedent (e.g. *Heller*, *Bruen*, and *Rahimi*) and the historical record discussed in those cases and *Anderson*, California's prohibition on possession of a firearm by a felon withstands constitutional scrutiny under the Second Amendment.

20

Accordingly, appellant's Second Amendment challenge to section 29800, subdivision (a)(1) fails.

## III. Appellant's Conviction for Carrying a Loaded Firearm in Public Is Valid

Appellant next contends that California's concealed carry license laws are unconstitutional in light of *Bruen*. Accordingly, he asserts that his conviction for carrying a loaded firearm in public under section 25850 is invalid. We disagree.

### A. *Relevant law*

Section 25850, subdivision (a) generally provides that "[a] person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place." The provision is one component of California's " 'multifaceted statutory scheme regulating firearms,' " which also prohibits under section 25400, " 'carrying concealed firearms in public, whether loaded or unloaded,' " and, under section 26350, " 'carrying unloaded handguns openly on the person in a public place or on a public street.' " (*People v. Miller* (2023) 94 Cal.App.5th 935, 939 (*Miller*), quoting *Peruta v. County of San Diego* (9th Cir. 2016) 824 F.3d 919, 925 (*Peruta*) [abrogated on other grounds by *Bruen*, *supra*, 597 U.S. 1].)

This statutory scheme, however, does not impose a complete prohibition on carrying a firearm in public. Instead, "section 25850 is in effect the enforcement mechanism of a regulatory regime that grants licenses to those who may lawfully carry firearms and withholds licenses from those who may not." (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 915 (*T.F.-G.*).) The limitations set by sections 25850 and 25400 do not apply to an individual who is licensed to carry a concealed firearm (§§ 25655,

26010), one of "numerous exceptions" to the general prohibitory scheme. (*Peruta, supra,* 824 F.3d at pp. 925–926.)

California's concealed carry licensing regime is governed by sections 26150 through 26235. During times relevant to this case, an application for a concealed carry license required proof of "good cause" for issuance of the license, and licensing authorities retained discretion on whether to issue a license. (Former §§ 26150, 26155; *People v. Mosqueda* (2023) 97 Cal.App.5th 399, 406–407 (*Mosqueda*).) Effective January 1, 2024, the Legislature amended sections 26150 and 26155 by providing that licensing authorities "shall issue" (instead of "may issue") licenses, and by eliminating the "good cause" requirement, among other changes. (See § 26150, subds. (a)(1)–(2), (b), as amended by Stats. 2023, ch. 249, § 10, eff. Jan. 1, 2024; § 26155, subds. (a)(1)–(2), (b), as amended by Stats. 2023, ch. 249, § 11, eff. Jan. 1, 2024.) Our focus remains on the former statutory scheme, however, as this is the subject of appellant's challenge.

## B.    *Appellant's facial challenge to concealed carry laws*

Appellant makes a facial challenge to California's former concealed carry laws, arguing that California's former "good cause" requirement is equivalent to the "proper cause" standard found invalid in *Bruen*. *Bruen* held that New York's "proper cause" licensing requirement was unconstitutional because it prevented "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." (*Bruen, supra,* 597 U.S. at p. 71.) Appellant asserts that, because the licensing scheme that he was convicted under was similarly unconstitutional, there could be no crime in California of carrying a loaded firearm without a license.

1. *Appellant has standing to make a facial challenge*

Before turning to the merits of appellant's argument, we address an issue raised by respondent. The People urge us to find that appellant lacks standing to challenge the validity of the former section 25850 because appellant does not claim that he applied for a concealed carry license, and, even if he had, he would not have been eligible for the license due to his status as a convicted felon. (§ 29800, subd. (a)(1); see *Anderson, supra,* 104 Cal.App.5th at p. 601 ["[d]efendant did not have, and as a felon was not eligible to obtain, a license to carry a concealed weapon"].) Since appellant would not have been eligible for a concealed carry license, regardless of the "good cause" requirement, the People contend that appellant's interest in the constitutionality of the former licensing scheme is merely "conjectural" or "hypothetical." To have standing, a party generally must have a beneficial interest in the controversy; " 'that is, he or she must have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is concrete and actual, and not conjectural or hypothetical.' " (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 599.)

The People's lack of standing argument—which attempts to graft an "as applied" standard onto a facial challenge—has been rejected by other courts in similar circumstances. (See *T.F.-G., supra,* 94 Cal.App.5th at pp. 912–913 [juvenile defendant not required to demonstrate "that the 'public-carry licensing scheme is unconstitutional as applied to him' " to have standing]; *D.L.,*

23

*supra*, 93 Cal.App.5th at p. 161 [juvenile found to have unlawfully possessed a loaded firearm had standing to bring facial challenge to constitutionality of section 25850]; *Mosqueda, supra*, 97 Cal.App.5th at p. 403 ["agree[ing] with our judicial peers" that defendants charged with unlawfully carrying a firearm "had standing to raise the defense by demurrer"].) As explained in *D.L.*, the general rule—that one who has failed to " 'make the required application' " for a license is " 'not at liberty to complain because of his or her anticipation of improper or invalid action,' "—does not apply " 'where a statute is invalid upon its face and an attempt is made to enforce its penalties in violation of constitutional right.' " (93 Cal.App.5th at p. 158, quoting *Smith v. Cahoon* (1931) 283 U.S. 553, 562 [75 L.Ed. 1264, 51 S.Ct. 582].)

We likewise conclude that appellant has standing to make a facial challenge to the former concealed carry laws. The analysis is relatively straightforward. Appellant was convicted of the statutory offense, section 25850, subdivision (a). Appellant contends that the statute, as part of the former statutory scheme, was unconstitutional on its face, not just as applied to him. If appellant is correct that the statute was facially unconstitutional, it would follow that his conviction for the offense would be vacated (as, presumably, similar convictions suffered by other defendants could be). On the other hand, if he is incorrect, the conviction will remain valid. Appellant's interest, therefore, is not merely conjectural or hypothetical, but is directly affected by the facial constitutionality of the former concealed carry laws. (See *D.L., supra*, 93 Cal.App.5th at pp. 156 & 158 [holding that the appellant had standing "because he is challenging the *facial* constitutionality of a criminal statute under which he has been

24

convicted" and adopting the "principle that criminal defendants may raise a facial challenge to the statutory framework under which they are convicted"].)

2.  *Appellant's challenge fails*

In making a facial challenge to section 25850, appellant confronts a heavy burden. " ' " 'To support a determination of facial unconstitutionality, . . . [challengers] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute.' " ' [Citation]. Rather, the 'minimum' our cases have accepted is a showing that the statute is invalid 'in the *generality* or *great majority* of cases.' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 388 (*Buenrostro*); see also *T.F.-G., supra* 94 Cal.App.5th at pp. 916–917 [applying same standard in facial challenge to section 25850].)

Appellant contends that former sections 26150 and 26155's "good cause" requirement for issuance of concealed carry licenses, in effect at times relevant to his case, renders the entirety of the subject statutory scheme, including section 25850, unconstitutional. As noted, *Bruen, supra,* 597 U.S. at page 71, held that a similar "proper-cause" license requirement, operative in New York, was unconstitutional.

A number of opinions have addressed the constitutionality of California's former licensing scheme. These opinions have recognized that the "good cause" requirement, taken alone, violates the Second Amendment in light of *Bruen*. (See *Mosqueda, supra*, 97 Cal.App.5th at p. 408; *T.F.-G, supra*, 94 Cal.App.5th at p. 913; *D.L., supra,* 93 Cal.App.5th at p. 162, fn. 10.) Indeed, the People concede that the former "good cause" requirement, by itself, is unconstitutional.

25

That limited conclusion does not end the analysis, however. As explained in *T.F.-G., supra,* 94 Cal.App.5th at page 913, "*Bruen*, *McDonald*, and *Heller* did not involve facial constitutional challenges to provisions criminalizing carrying firearms without a license, but only challenges to particular restrictions on either the availability or utility of licenses." In contrast, the facial challenge made by appellant here (as well as the appellant in *T.F.-G.*) is "fundamentally different." (*Id.* at p. 914.) Appellant disputes "the state's authority to impose criminal penalties on *any* individual who carries a loaded handgun in public in violation of the state's license regime, regardless of whether the noncompliance stemmed from a constitutionally sound requirement." (*Ibid.*) As appellant makes a facial (as opposed to an as-applied) challenge, "it is not enough to show that a statute may have an unconstitutional application to a hypothetical person lawfully carrying a firearm in public for self-defense after failing to secure a license due to a 'good cause' requirement." (*Id.* at p. 915.) Rather, appellant must demonstrate that the statutory scheme is unconstitutional in the generality or great majority of cases. (*Buenrostro, supra,* 6 Cal.5th 367, 388; see also *T.F.-G., supra,* at pp. 915–916.)

Since we are examining one flaw—the former "good cause" requirement—in the context of an entire statutory scheme, " ' "we try to limit the solution to the problem" ' by 'severing any "problematic portions while leaving the remainder intact." ' [Citation.] The unconstitutionality of a part of a statute ' "does not necessarily defeat or affect the validity of its remaining provisions," ' and so the ' "normal rule" is "that partial, rather than facial, invalidation is the required course." ' " (*D.L., supra,* 93 Cal.App.5th at p. 162, quoting *Free Enterprise Fund v. Public*

26

*Company Accounting Oversight Bd.* (2010) 561 U.S. 477, 508 [177 L.Ed.2d 706, 130 S.Ct. 3138].)

As determined in *D.L., supra,* 93 Cal.App.5th at pages 163–164, the "good cause" provisions in former sections 26150 and 26155 are severable from the remainder of California's licensing requirements. (See also *T.F.-G., supra,* 94 Cal.App.5th at p. 916 [following "the *D.L.* court's persuasive determination that the 'good cause' licensing requirement is severable"].) The *D.L.* court explained that the provisions are grammatically, functionally, and volitionally severable from the remainder of the subject statutes. (*D.L.* at pp. 163–164.) Indeed, the Legislature's recent amendments to the statutes, including its deletions of the "good cause" provisions, demonstrate just how severable the provisions were. We thus agree with the *D.L.* court's conclusion that, given the severability of the former "good cause" provisions, facial invalidation of California's concealed carry licensing scheme is unwarranted.

Moreover, as discussed in part II, *ante,* the Supreme Court has recognized the general viability of licensing regimes with " 'narrow, objective, and definite standards' " that are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " (*Bruen, supra,* 597 U.S. at p. 38, fn. 9.) Appellant does not contend that the remainder of California's licensing scheme fails to meet this standard. As explained in *D.L.*, after considering severance of the "good cause" provisions, "California's firearm licensing framework—and the criminal penalties under section 25850—remain valid." (*D.L., supra,* 93 Cal.App.5th at p. 165.)

Finally, appellant asserts, in a single sentence, that, even if the "good cause" provisions are severable, severability cannot be

applied retroactively.  Because appellant does not support this contention with any citation to authority or reasoned analysis, we exercise our discretion to disregard it.  (See *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)  We do note, however, that a similar contention on retroactivity was rejected in *D.L., supra*, 93 Cal.App.5th at pages 164–165, observing that the argument could be raised only in an as-applied challenge, but would be nonmeritorious regardless.

Accordingly, we reject appellant's challenge to California's former concealed carry laws and his parallel argument contesting his conviction for carrying a loaded firearm in public.

## IV.    The Trial Court Erred in Imposing a Concurrent Sentence Rather than Staying the Sentence on Count 2 Under Section 654

Finally, appellant contends that the three-year concurrent sentence on count 2 should be stayed pursuant to section 654 because counts 1 and 2 were based on one indivisible course of conduct incident to a single objective.  (See *People v. Jones* (2012) 54 Cal.4th 350, 357 (*Jones*) ["a single possession or carrying of a single firearm on a single occasion may be punished only once under section 654"].)  The People agree, as do we.

A person may be convicted of more than one crime for the same act, but section 654 proscribes multiple punishments for the same act.  (§§ 654, 954; *People v. Correa* (2012) 54 Cal.4th 331, 337.)  Here, appellant was convicted of possession of a firearm by a felon (count 1) and carrying a loaded firearm in public (count 2) for the same act committed on May 5, 2022.  Appellant may be punished only once for this single incident.  (*People v. Corpening* (2016) 2 Cal.5th 307, 312 ["possessing a particular firearm on a

single occasion constituted a single physical act that 'may be punished only once under section 654' "]; *Jones, supra,* 54 Cal.4th at p. 357.) Under these circumstances, the proper " 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' " (*Jones*, at p. 353.)

However, remand for resentencing in this case is unnecessary because the punishment is the same for counts 1 and 2 (§ 18), and a remand would not change appellant's sentence. We will therefore modify the judgment to stay the sentence on count 2 in accordance with section 654. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473 [exercising authority under section 1260 to modify judgment rather than remand as remedy for trial court's failure to impose and stay sentence].)

## DISPOSITION

The judgment is modified to stay the sentence on count 2 under Penal Code section 654. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


RICHARDSON, J.